# Syllabus

Chief Justice:
Robert P. Young, Jr.

Justices:
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Corbin R. Davis

PEOPLE v HARTWICK
PEOPLE v TUTTLE

Docket Nos. 148444 and 148971. Argued January 15, 2015 (Calendar Nos. 5 and 6). Decided July 27, 2015.

Richard Lee Hartwick was charged in the Oakland Circuit Court with manufacturing marijuana and possessing it with the intent to deliver it. Hartwick was a registered qualifying patient under the Michigan Medical Marihuana Act (MMMA). He served as his own primary caregiver and the primary caregiver for five other registered qualifying patients to whom he was properly connected under the MMMA. The police, acting on a tip, confronted Hartwick and later conducted a consent search of his home where the police discovered a disputed number of marijuana plants and approximately 3.69 ounces of marijuana. Hartwick moved to dismiss the charges, claiming immunity under § 4 of the MMMA, MCL 333.26424, and the affirmative defense under § 8 of the MMMA, MCL 333.26428. In the alternative, Hartwick sought permission to present a § 8 defense at trial. The trial court, Colleen A. O'Brien, J., denied the motions. The Court of Appeals denied Hartwick's delayed application for leave to appeal. The Supreme Court, in lieu of granting leave to appeal, remanded the case to the Court of Appeals for consideration as on leave granted. 493 Mich 950 (2013). The Court of Appeals, SAAD, P.J., and SAWYER, J. (JANSEN, J., concurring), affirmed the trial court. 303 Mich App 247 (2013). The Supreme Court granted leave to appeal in Docket No. 148444. 496 Mich 851 (2014).

Robert Tuttle was charged in the Oakland Circuit Court with three counts of delivering marijuana, one count of manufacturing marijuana, one count of possessing marijuana with the intent to deliver it, and two counts of possession of a firearm during the commission of a felony. Tuttle was a registered qualifying patient under the MMMA who served as his own primary caregiver. It was unclear whether he was properly connected as the primary caregiver to one or two other registered qualifying patients. Tuttle was arrested for selling marijuana on three occasions to an individual with whom Tuttle was not properly connected under the MMMA. Tuttle claimed immunity under § 4 and the affirmative defense under § 8 of the MMMA. The trial court, Michael D. Warren, Jr., J., rejected both claims and denied Tuttle's request to present a § 8 defense at trial. According to the court, immunity was not appropriate because Tuttle's illegal conduct—selling marijuana to an individual outside the protection of the MMMA— tainted Tuttle's conduct with regard to the other charges. The trial court denied Tuttle use of the affirmative defense in § 8 because Tuttle failed to present prima facie evidence of each element of the defense. The Court of Appeals denied Tuttle's application for leave to appeal. In lieu of

granting Tuttle's application for leave to appeal, the Supreme Court remanded the case to the Court of Appeals for consideration as on leave granted. 493 Mich 950 (2013). The Court of Appeals, SAAD, P.J., and SAWYER, J. (JANSEN, J., concurring), affirmed the trial court. 304 Mich App 72 (2014). The Supreme Court granted leave to appeal in Docket No. 148971. 496 Mich 851.

In a unanimous opinion by Justice ZAHRA, the Supreme Court *held*:

The availability of immunity under § 4 of the MMMA is a question of law to be decided before trial, and a defendant has the burden of proving by a preponderance of the evidence his or her entitlement to immunity. Immunity must be claimed for each charged offense, and the burden of proving immunity is separate and distinct for each offense. Conduct that is noncompliant with the MMMA with respect to one charged offense does not automatically rebut the presumption of medical use with respect to conduct relating to any other charged offenses. Rather, noncompliant conduct involved in one charged offense can negate otherwise compliant conduct involved in a separate charged offense if there is a nexus between the noncompliant and the otherwise compliant conduct. Raising an affirmative defense under § 8 of the MMMA requires a caregiver to present prima facie evidence of each element of the defense for him- or herself and for each registered qualifying patient to which the caregiver is connected. Having established a prima facie case, the defendant has the burden of proving each element by a preponderance of the evidence. A valid registry identification card does not create any presumption for purposes of § 8.

1. The lower courts erred by denying Hartwick § 4 immunity without properly making the factual determinations required by § 4. The Court of Appeals failed to recognize that the trial court did not make proper factual determinations on the elements of § 4, specifically, the number of plants Hartwick possessed. In addition, the trial court and the Court of Appeals erred by concluding that Hartwick should have known his registered qualifying patients' debilitating conditions, the amount of marijuana they needed, and the identities of their physicians. Section 4 does not require that knowledge. To establish immunity under § 4 of the MMMA, the defendant must prove four elements by a preponderance of the evidence: (1) the defendant possessed a valid registry identification card; (2) the defendant complied with the requisite volume limitations in § 4(a) and § 4(b); (3) the defendant kept any marijuana plants in an enclosed, locked facility; and (4) the defendant was engaged in the medical use of marijuana. Under the MMMA, a defendant is presumed to be engaged in the medical use of marijuana if the defendant possesses a valid registry identification card and is not in violation of the volume limitations. The presumption is rebuttable by evidence that a defendant's conduct was not for the purpose of alleviating a qualifying patient's debilitating medical condition or its symptoms. If a presumption of medical use has been rebutted, the defendant may still prove by a preponderance of the evidence that the defendant's conduct was in furtherance of the administration of marijuana to treat or alleviate a registered qualifying patient's debilitating medical condition or symptoms associated with the debilitating medical condition under MCL 333.26423(f). The written certification necessary to obtain a registry identification card is not similar to a pharmaceutical prescription and satisfies none of the elements of a § 8 defense. *People v Hartwick* had to be remanded to the trial court for an evidentiary hearing to determine the number of plants in Hartwick's possession and whether Hartwick was entitled to § 4 immunity.

2. The Court of Appeals properly held that Hartwick was not entitled to raise the affirmative defense under § 8 because he failed to present prima facie evidence of each element of the defense. A primary caregiver must provide prima facie evidence of all § 8(a) elements for him- or herself and for the registered qualifying patients to which he or she is connected under the MMMA. Specifically, Hartwick failed to provide evidence of a bona fide physician-patient relationship for himself, as a patient, and his connected patients, he failed to provide evidence that a physician conducted a full assessment of his and his patients' medical histories and current medical conditions, and he failed to show that a physician determined that he and his patients had debilitating medical conditions that would likely benefit from the medical use of marijuana. Hartwick further failed to present prima facie evidence that the amount of marijuana he possessed was not more than was reasonably necessary to ensure its uninterrupted availability for the treatment of his and his patients' debilitating medical conditions. Finally, Hartwick failed to present prima facie evidence that he and his patients were engaged in the use of marijuana for a medical purpose.

3. The Court of Appeals erred by concluding that Tuttle's unprotected conduct with the unconnected individual tainted what might otherwise be protected conduct on which additional separate charges were based. A defendant must raise the claim of § 4 immunity to each charged offense, the trial court must decide as a matter of law before trial whether to grant the defendant's motion for immunity, and the defendant must prove immunity by a preponderance of the evidence each time immunity is raised. The defendant's burden of proving entitlement to immunity is separate and distinct for each charged offense. MMMA-compliant conduct is not automatically tainted by the defendant's improper conduct related to a different charged offense unless there is a nexus between the improper conduct and the otherwise proper conduct. *People v Tuttle* had to be remanded to the trial court for an evidentiary hearing to determine whether there was a nexus between the charges based on Tuttle's improper conduct and the charges based on Tuttle's otherwise proper conduct, in addition to other factual findings.

4. The Court of Appeals properly held that Tuttle could not claim the affirmative defense under § 8 because he failed to establish prima facie evidence of at least one of the elements of the defense for each of his possibly connected patients. Specifically, Tuttle failed to provide evidence of the actual amount of marijuana needed to treat his patients; the evidence showed only the actual amount of marijuana each patient obtained from Tuttle. In addition, Tuttle failed to show that one patient had undergone a full medical assessment in the course of a bona fide physician-patient relationship.

*Hartwick* affirmed in part, reversed in part, and remanded to the trial court for an evidentiary hearing to determine Hartwick's entitlement to § 4 immunity.

*Tuttle* affirmed in part, reversed in part, and remanded to the trial court for an evidentiary hearing to determine Tuttle's entitlement to § 4 immunity.

©2015 State of Michigan

# OPINION

Chief Justice:
Robert P. Young, Jr.

Justices:
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein

FILED July 27, 2015

S T A T E   O F   M I C H I G A N

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

No. 148444

RICHARD LEE HARTWICK,

Defendant-Appellant.

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

No. 148971

ROBERT TUTTLE,

Defendant-Appellant.

BEFORE THE ENTIRE BENCH

ZAHRA, J.

In 2008, the voters of Michigan passed into law a ballot initiative[1] now codified as the Michigan Medical Marihuana[2] Act (MMMA), MCL 333.26421 *et seq.* Unlike the procedures for the editing and drafting of bills proposed through the Legislature, the electorate—those who enacted this law at the ballot box—need not review the proposed law for content, meaning, readability, or consistency.[3]

---

[1] Under Article 2, § 9 of the 1963 Michigan Constitution, "[t]he people reserve to themselves the power to propose laws and to enact and reject laws, called the initiative . . . ." A voter initiative may be invoked by a relatively small number of registered voters. "To invoke the initiative . . . , petitions signed by a number of registered electors, not less than eight percent . . . of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected shall be required." Const 1963, art 2, § 9.

[2] The MMMA uses the variant "marihuana." Throughout this opinion, we use the vernacular "marijuana" unless quoting from the statute.

[3] Members of the Legislature generally request that the Legislative Council, a bipartisan, bicameral body of legislators established in Article 4, § 15 of the 1963 Constitution of Michigan, see that bills to be proposed in their respective chambers are drafted. See Const 1963, art 4, § 15; MCL 4.1103; MCL 4.1105. The council oversees the Legislative Service Bureau. MCL 4.1105. The bureau has a director and staff, and maintains a legislative reference library containing material which may be of use in connection with drafting and editing proposed legislation. MCL 4.1106; MCL 4.1107. At the request of the members of the Legislature, the bureau drafts "bills and resolutions or amendments to, or substitutes for, bills and resolutions; draft[s] conference committee reports; and examine[s], check[s], and compare[s] pending bills with other pending bills and existing laws to avoid so far as possible contrary or conflicting provisions." MCL 4.1108(a). In sum, the Legislature has a staff of experienced attorneys who work with the various legislators to develop and revise any manner of laws. After a bill is drafted and supported, the chambers of the Legislature may refer it to conference committees for additional review by legislators and the public. The Governor also has an opportunity to review bills before signing them into law. This extensive drafting process works to clarify language, limit confusion and mistakes, and in a general sense, ensure that enacted laws have a modicum of readability and consistency.

2

This lack of scrutiny in the lawmaking process is significant because initiatives such as the MMMA cannot be modified "except by a[nother] vote of the electors" or by a three-fourths vote of each chamber of the Legislature.[4] This constraint on Legislative power suggests that there can be matters of public policy so important to the people that they cannot be left in the hands of the elected legislators. But this constitutionally protected reservation of power by the people comes with a cost. The lack of procedural scrutiny in the initiative process leaves the process susceptible to the creation of inconsistent or unclear laws that may be difficult to interpret and harmonize. The MMMA is such a law. While the MMMA has been the law in Michigan for just under seven years, this Court has been called on to give meaning to the MMMA in nine different cases.[5] The many inconsistencies in the law have caused confusion for medical marijuana caregivers and patients, law enforcement, attorneys, and judges, and have consumed valuable public and private resources to interpret and apply it. This confusion mainly stems from the immunity, MCL 333.26424 (§ 4), and the affirmative defense, MCL 333.26428 (§ 8), provisions of the MMMA. We granted leave in *People v*

---

[4] See Const 1963, art 2, § 9.

[5] The Court previously interpreted the MMMA in the following cases: *People v Mazur*, 497 Mich ___; 854 NW2d 719 (2015); *Ter Beek v City of Wyoming*, 495 Mich 1; 846 NW2d 531 (2014); *People v Green*, 494 Mich 865 (2013); *People v Koon*, 494 Mich 1; 832 NW2d 724 (2013); *State v McQueen*, 493 Mich 135; 828 NW2d 644 (2013); *People v Bylsma*, 493 Mich 17; 825 NW2d 543 (2012); *People v Kolanek*, 491 Mich 382; 817 NW2d 528 (2012). This term, the Court granted leave in *People v Hartwick*, 496 Mich 851 (2014), and *People v Tuttle*, 496 Mich 851 (2014).

3

*Hartwick*[6] and *People v Tuttle*[7] to once again consider the meaning and application of these two very important sections of the MMMA.[8]

---

[6] In *Hartwick*, we directed the parties to address the following questions:

> (1) whether a defendant's entitlement to immunity under § 4 of the Michigan Medical Marihuana Act (MMMA), MCL 333.26421 *et seq.*, is a question of law for the trial court to decide; (2) whether factual disputes regarding § 4 immunity are to be resolved by the trial court; (3) if so, whether the trial court's finding of fact becomes an established fact that cannot be appealed; (4) whether a defendant's possession of a valid registry identification card establishes any presumption for purposes of § 4 or § 8; (5) if not, what is a defendant's evidentiary burden to establish immunity under § 4 or an affirmative defense under § 8; (6) what role, if any, do the verification and confidentiality provisions in § 6 of the act play in establishing entitlement to immunity under § 4 or an affirmative defense under § 8; and (7) whether the Court of Appeals erred in characterizing a qualifying patient's physician as issuing a prescription for, or prescribing, marijuana. [*Hartwick*, 496 Mich at 851.]

[7] In *Tuttle*, we directed the parties to address the following questions:

> (1) whether a registered qualifying patient under the Michigan Medical Marihuana Act (MMMA), MCL 333.26421 *et seq.*, who makes unlawful sales of marijuana to another patient to whom he is not connected through the registration process, taints all aspects of his marijuana-related conduct, even that which is otherwise permitted under the act; (2) whether a defendant's possession of a valid registry identification card establishes any presumption for purposes of § 4 or § 8; (3) if not, what is a defendant's evidentiary burden to establish immunity under § 4 or an affirmative defense under § 8; and (4) what role, if any, do the verification and confidentiality provisions in § 6 of the act play in establishing entitlement to immunity under § 4 or an affirmative defense under § 8. [*Tuttle*, 496 Mich at 851-852.]

[8] The same panel of the Court of Appeals presided over *People v Hartwick* and *People v Tuttle*.

For the reasons fully explained in this opinion regarding § 4, we hold:

(1) entitlement to § 4 immunity is a question of law to be decided by the trial court before trial;

(2) the trial court must resolve factual disputes relating to § 4 immunity, and such factual findings are reviewed on appeal for clear error;

(3) the trial court's legal determinations under the MMMA are reviewed de novo on appeal;

(4) a defendant may claim immunity under § 4 for each charged offense if the defendant shows by a preponderance of the evidence that, at the time of the charged offense, the defendant

(i) possessed a valid registry identification card,

(ii) complied with the requisite volume limitations of § 4(a) and § 4(b),

(iii) stored any marijuana plants in an enclosed, locked facility, and

(iv) was engaged in the medical use of marijuana;

(5) the burden of proving § 4 immunity is separate and distinct for each charged offense;

(6) a marijuana transaction by a registered qualifying patient or a registered primary caregiver that is not in conformity with the MMMA does not per se taint all aspects of the registered qualifying patient's or registered primary caregiver's marijuana-related conduct;

(7) a defendant is entitled to a presumption under § 4(d) that he or she was engaged in the medical use of marijuana if the defendant has shown by a preponderance of the evidence that, at the time of the charged offense, the defendant

(i) possessed a valid registry identification card, and

(ii) complied with the requisite volume limitations of § 4(a) and § 4(b);[9]

(8) the prosecution may rebut the § 4(d) presumption that the defendant was engaged in the medical use of marijuana by presenting evidence that the defendant's conduct was not for the purpose of alleviating the registered qualifying patient's debilitating medical condition;

(9) non-MMMA-compliant conduct may rebut the § 4(d) presumption of medical use for otherwise MMMA-compliant conduct if a nexus exists between the non-MMMA-compliant conduct and the otherwise MMMA-compliant conduct;

(10) if the prosecution rebuts the § 4(d) presumption of the medical use of marijuana, the defendant may still establish, on a charge-by-charge basis, that the conduct underlying a particular charge was for the medical use of marijuana; and

(11) the trial court must ultimately weigh the evidence to determine if the defendant has met the requisite burden of proof as to all elements of § 4 immunity.

Regarding § 8, we hold:

(1) a defendant must present prima facie evidence of each element of § 8(a) in order to be entitled to present a § 8 affirmative defense to a fact-finder;

(2) if the defendant meets this burden, then the defendant must prove each element of § 8(a) by a preponderance of the evidence; and

(3) a valid registry identification card does not establish any presumption under § 8.[10]

---

[9] A valid registry identification card is a prerequisite to establish immunity under § 4. But possession of a valid registry identification card, alone, does not establish any presumption for the purpose of § 4. Further, the verification and confidentiality provisions in § 6(c) and § 6(h) do not establish that a defendant has engaged in the medical use of marijuana, or complied with the requisite volume and storage limitations of § 4.

[10] A valid registry identification card is prima facie evidence that a physician has determined the registered qualifying patient has a debilitating medical condition and will

6

For the reasons stated in this opinion, and in accordance with the conclusions of law described above, we affirm in part, and reverse in part, the November 19, 2013 judgment of the Court of Appeals in *People v Hartwick*.[11] We further remand *Hartwick* to the trial court for an evidentiary hearing regarding Hartwick's entitlement to immunity under § 4. In *People v Tuttle*, we affirm in part, and reverse in part, the January 30, 2014 judgment of the Court of Appeals.[12] We also remand *Tuttle* to the trial court for an evidentiary hearing regarding Tuttle's entitlement to immunity under § 4.

## I. STATEMENT OF FACTS

### A. *PEOPLE V HARTWICK*

In late 2011, police officers in Oakland County received a tip regarding a marijuana growing operation at Hartwick's home. Law enforcement officers confronted Hartwick, who admitted growing marijuana, but stated he was in compliance with the MMMA. After consenting to a search of his home, Hartwick led the police officers to a

---

likely benefit from the medical use of marijuana to treat the debilitating medical condition. In addition, a valid registry identification card issued after April 1, 2013, the effective date of 2012 PA 512, is also prima facie evidence that a physician has conducted a full, in-person assessment of the registered qualifying patient. We reach this conclusion because § 6(c) requires the state to verify all the information contained in an application for a registry identification card; therefore, a valid registry identification card is prima facie evidence of anything contained in the application. This prima facie evidence satisfies two elements of § 8(a)(1), but does not satisfy the last element requiring prima facie evidence of a bona fide physician-patient relationship.

[11] *People v Hartwick*, 303 Mich App 247; 842 NW2d 545 (2013).

[12] *People v Tuttle*, 304 Mich App 72; 850 NW2d 484 (2014).

7

bedroom containing dozens of marijuana plants in varying sizes.[13] The police officers also found a total of 104.6 grams—approximately 3.69 ounces—of usable marijuana in the home.

The Oakland County Prosecutor charged Hartwick with manufacturing 20 to 200 marijuana plants and possession with intent to deliver marijuana. Hartwick moved to dismiss those charges based on both the immunity (§ 4) and the affirmative defense (§ 8) provided in the MMMA. The trial court held an evidentiary hearing at which Hartwick was the only witness. Hartwick testified that he was a medical marijuana patient and his own caregiver,[14] and a connected[15] primary caregiver to five registered qualifying patients. He submitted into evidence the registry identification cards for himself and the

---

[13] Hartwick alleges 71 plants were found, while the police allege he possessed 77 plants. *Hartwick*, 303 Mich App at 253-254, 259-260. Additionally, while this issue was not appealed, we note that Hartwick testified the door to the bedroom was locked before he unlocked it for the police, while the police allege it was unlocked when they arrived.

[14] We do not use the terms "patient" and "caregiver" in the traditional sense associated with a patient/medical provider relationship. Rather, we use these terms because they are used in the MMMA. Under the MMMA, a medical marijuana user, or "patient," may elect to either manufacture marijuana for personal medical use or have someone else manufacture and supply marijuana to him or her. Such a supplier is known under the MMMA as a "primary caregiver." We refer to the qualifying patient as being his or her "own caregiver" when the patient has not designated a primary caregiver. We use the terms "patient" and "caregiver" throughout this opinion simply to track the language of the MMMA and not to suggest that someone asserting a defense or immunity under the MMMA is a "patient" or "caregiver" as those terms are generally understood. Whether one is a "patient" or "caregiver" under the MMMA, as opposed to a supplier or user of illegal marijuana, is a question to be resolved on a case-by-case basis.

[15] When a qualifying patient elects a primary caregiver, a registry identification card is also issued to the primary caregiver. When a qualifying patient has properly designated a primary caregiver under the MMMA, the primary caregiver is said to be "connected" to that particular qualifying patient.

five connected qualifying patients. Hartwick could not identify the debilitating conditions suffered by two of the qualifying patients statutorily connected to him. Further, Hartwick could not identify the certifying physician for any of the five connected qualifying patients.

The trial court concluded that Hartwick was not entitled to § 4 immunity. The court reasoned that Hartwick did not comply with the requirements of the MMMA because he did not know if the patients connected to him even had debilitating medical conditions.[16]

The trial court similarly denied Hartwick's motion to dismiss under § 8 and his motion in the alternative to present a § 8 affirmative defense to the jury. The court determined that Hartwick failed to present "testimony regarding a 'bona fide physician-patient relationship or a likelihood of receiving therapeutic or palliative benefit from the medical use of marijuana,' or any testimony on whether defendant possessed no more marijuana than reasonably necessary for medical use."[17] Thus, Hartwick failed to establish his entitlement to a § 8 affirmative defense.

The Court of Appeals affirmed the trial court, rejecting Hartwick's contention "that his possession of a registry identification card automatically immunizes him from prosecution under § 4 and grants him a complete defense under § 8."[18] The Court of

---

[16] An individual claiming § 4 immunity must comply with the requirement that marijuana be only for a medical use.

[17] *Hartwick*, 303 Mich App at 255.

[18] *Id*. at 251.

9

Appeals focused on the "primary purpose" of the MMMA, "which is to ensure that any marijuana production and use permitted by the statute is medical in nature and only for treating a patient's debilitating medical condition."[19]

## B. *PEOPLE V TUTTLE*

Tuttle was a registered qualifying patient and his own caregiver. He was also connected as a registered primary caregiver to at least one other registered qualifying patient.[20] On three separate occasions in early 2012, Tuttle sold marijuana to William Lalonde even though Tuttle was not formally connected to Lalonde under the MMMA. In addition to arresting Tuttle for providing marijuana to Lalonde, the Oakland County Sheriff's Office searched Tuttle's home where they found 33 marijuana plants, 38 grams of marijuana (approximately 1.34 ounces), and several weapons locked in a gun safe. Tuttle was subsequently charged with multiple counts related to the possession, delivery, and manufacture of marijuana, as well as possession of a firearm during the commission of a felony.[21]

---

[19] *Id.*

[20] At all relevant times, Tuttle was connected as a registered primary caregiver for Michael Batke. Additionally, Tuttle was at some point connected as a primary caregiver to Frank Colon. It is unclear whether Colon remained connected to Tuttle at the time of Tuttle's offenses in this case. Colon may have renewed his MMMA card and listed himself as his own caregiver. Notwithstanding this possible inconsistency, Colon testified in the lower court that Tuttle supplied him with marijuana for his personal medical use. See pages 11and 12 of this opinion.

[21] Counts I-III relate to Tuttle's provision of marijuana to Lalonde. Counts IV-VII relate to the marijuana found in Tuttle's home.

Tuttle attempted to invoke the immunity provided under § 4 for counts IV-VII relating to possession of the marijuana in his home. Tuttle argued that he possessed a valid registry identification card and complied with the volume and storage limitations of § 4(a) and § 4(b). The prosecution argued that Tuttle did not comply with the requirements of § 4 because Tuttle provided marijuana to Lalonde outside the parameters of the MMMA. According to the prosecution, these transactions (for which Tuttle was charged in counts I-III) tainted all of Tuttle's marijuana-related activity. The trial court agreed and denied Tuttle's motion under § 4 for immunity and dismissal of the charges.

Tuttle then raised the § 8 affirmative defense to counts I-III. At an evidentiary hearing, Tuttle presented his registry identification card and the registry identification cards belonging to two allegedly connected qualifying patients: Michael Batke and Frank Colon. Lalonde, Batke, and Colon testified at the hearing.

Lalonde testified that he was a registered qualifying patient who met Tuttle through an internet site that purported to match medical marijuana patients with caregivers. Lalonde also testified that he told Tuttle he used marijuana to treat chronic pain. Batke testified that he was a registered qualifying patient and that Tuttle was properly connected to him under the MMMA as a registered primary caregiver. Batke also testified that he would call Tuttle every time he needed marijuana, and Tuttle provided Batke with approximately two ounces of marijuana a month. Lastly, Colon testified that he was a medical marijuana patient, that he had a debilitating medical

11

condition,[22] and that he utilized Tuttle as a primary caregiver. Colon stated he requested between one and two ounces of marijuana a week from Tuttle.

After the evidentiary hearing, the trial court determined that Tuttle did not present prima facie evidence for each element of § 8(a). Specifically, the trial court determined that Tuttle failed to present any evidence that the medical marijuana users to whom Tuttle was connected had physicians who "completed a full assessment of each patient's medical history and current medical condition" as required by § 8(a)(1).[23] The court also concluded that Tuttle failed to establish a question of fact regarding whether the quantity of marijuana he possessed was reasonable under § 8(a)(2).[24] The Court of Appeals affirmed the trial court and additionally concluded that Tuttle had not presented prima facie evidence as to Tuttle's own medical use of marijuana under § 8(a)(3).

Regarding § 4 immunity, the Court of Appeals concluded that providing marijuana to Lalonde tainted all of Tuttle's marijuana-related conduct thereby negating Tuttle's ability to invoke § 4 immunity for any charge. Regarding the affirmative defense available under § 8, the Court of Appeals concluded that Tuttle's registry identification card did not establish prima facie evidence of the required elements of § 8. The court

---

[22] The physician's statement indicates that Colon's debilitating medical condition was shoulder and lower back pain.

[23] *Tuttle*, 304 Mich App at 79.

[24] The trial court did find the testimony of Lalonde, Batke, and Colon credible as to their need for the medical use of marijuana to treat a debilitating medical condition under § 8(a)(3).

12

also concluded that the testimony of Tuttle's patients was equally deficient in presenting prima facie evidence of those elements.

## II. ANALYSIS

The possession, manufacture, and delivery of marijuana are punishable criminal offenses under Michigan law.[25] Under the MMMA, though, "[t]he medical use of marihuana is allowed under state law to the extent that it is carried out in accordance with the provisions of th[e] act."[26] The MMMA grants to persons in compliance with its provisions either immunity from, or an affirmative defense to, those marijuana-related violations of state law. In the cases before us, we must resolve questions surrounding the § 4 grant of immunity and the § 8 affirmative defense.

### A. STANDARD OF REVIEW

We review questions of statutory interpretation de novo.[27] The MMMA was passed into law by initiative. We must therefore determine the intent of the electorate in approving the MMMA, rather than the intent of the Legislature.[28] Our interpretation is ultimately drawn from the plain language of the statute, which provides "the most reliable evidence" of the electors' intent.[29] But as with other initiatives, we place "special

---

[25] See *Kolanek*, 491 Mich at 394 n 24.

[26] MCL 333.26427(a).

[27] *Kolanek*, 491 Mich at 393.

[28] *McQueen*, 493 Mich at 147 (" '[T]he intent of the electors governs' the interpretation of voter-initiated statutes, just as the intent of the Legislature governs the interpretation of legislatively enacted statutes.") (citation omitted).

[29] *Id.*

13

emphasis on the duty of judicial restraint."[30] Particularly, we make no judgment as to the wisdom of the medical use of marijuana in Michigan. This state's electors have made that determination for us. To that end, we do not attempt to limit or extend the statute's words. We merely bring them meaning derived from the plain language of the statute.

## B. SECTION 4 IMMUNITY

Section 4 grants broad immunity from criminal prosecution and civil penalties to "qualifying patient[s]"[31] and "primary caregiver[s]."[32] Subsection (a) specifically grants immunity to qualifying patients and states in relevant part:

> (a) A qualifying patient who has been issued and possesses a registry identification card[33] shall not be subject to arrest, prosecution, or penalty in any manner . . . for the medical use[34] of marihuana in accordance with

---

[30] *Schmidt v Dep't of Ed*, 441 Mich 236, 241-242; 490 NW2d 584 (1992).

[31] The MMMA defines "qualifying patient" or "patient" as "a person who has been diagnosed by a physician as having a debilitating medical condition." MCL 333.26423(i).

[32] The MMMA defines "primary caregiver" or "caregiver" as "a person who is at least 21 years old and who has agreed to assist with a patient's medical use of marihuana and who has not been convicted of any felony within the past 10 years and has never been convicted of a felony involving illegal drugs or a felony that is an assaultive crime . . . ." MCL 333.26423(h).

[33] The MMMA defines "registry identification card" as "a document issued by the department that identifies a person as a registered qualifying patient or registered primary caregiver." MCL 333.26423(j). The "department" is the "department of licensing and regulatory affairs." MCL 333.26423(c).

[34] "Medical use" is defined as "the acquisition, possession, cultivation, manufacture, use, internal possession, delivery, transfer, or transportation of marihuana or paraphernalia relating to the administration of marihuana to treat or alleviate a registered qualifying patient's debilitating medical condition or symptoms associated with the debilitating medical condition." MCL 333.26423(f).

this act, provided that the qualifying patient possesses an amount of marihuana that does not exceed 2.5 ounces of usable marihuana, and, if the qualifying patient has not specified . . . a primary caregiver . . . , 12 marihuana plants kept in an enclosed, locked facility.[35]

A registered qualifying patient, therefore, may possess up to 2.5 ounces of usable marijuana.[36] Additionally, a registered qualifying patient may possess up to 12 marijuana plants, kept in an enclosed, locked facility, unless that patient specified a primary caregiver during the state registration process.[37] Section 4 immunity also requires that the registered qualifying patient was engaged in the medical use of marijuana.

Similarly, § 4(b) provides immunity to registered primary caregivers. It states, in relevant part:

> (b) A primary caregiver who has been issued and possesses a registry identification card shall not be subject to arrest, prosecution, or penalty in any manner . . . for assisting a qualifying patient to whom he or she is connected through the department's registration process with the medical use of marihuana in accordance with this act. . . . This subsection applies only if the primary caregiver possesses an amount of marihuana that does not exceed:
>
> (1) 2.5 ounces of usable marihuana for each qualifying patient to whom he or she is connected through the department's registration process; and

---

[35] MCL 333.26424(a).

[36] "Usable marihuana" is defined as "the dried leaves and flowers of the marihuana plant, and any mixture or preparation thereof, but does not include the seeds, stalks, and roots of the plant." MCL 333.26423(k).

[37] When a patient does not specify a primary caregiver through the state registration process, the patient is typically considered his or her own caregiver. When no primary caregiver is properly identified under the law, the patient has legal authority to possess up to 12 marijuana plants.

(2) for each registered qualifying patient who has specified that the primary caregiver will be allowed under state law to cultivate marihuana for the qualifying patient, 12 marihuana plants kept in an enclosed, locked facility; and

(3) any incidental amount of seeds, stalks, and unusable roots.

A primary caregiver, therefore, may only possess up to 2.5 ounces of usable marijuana and 12 marijuana plants in an enclosed, locked facility for each registered qualifying patient who has specified the primary caregiver during the state registration process. Similar to § 4(a), this section only applies if the primary caregiver is assisting a qualifying patient with the medical use of marijuana.

### 1. PROCEDURAL ASPECTS OF § 4

We begin our analysis of the procedural aspects of § 4 with the rather unremarkable proposition that entitlement to immunity under § 4 is a question of law. Immunity is a unique creature in the law and is distinguishable from other traditional criminal defenses. A successful claim of immunity excuses an alleged offender for engaging in otherwise illegal conduct, regardless of the sufficiency of proofs in the underlying case. This is consistent with the way claims of immunity are handled in other areas of law.[38] Moreover, the parties agree that § 4 immunity should be determined as a matter of law. There is no indication that the voters who enacted the MMMA intended to treat § 4 immunity differently than other claims of immunity.

---

[38] *Morden v Grand Traverse Co*, 275 Mich App 325, 340; 738 NW2d 278 (2007) ("Whether a defendant is entitled to qualified immunity is a question of law . . . ."); *Snead v John Carlo, Inc*, 294 Mich App 343, 354; 813 NW2d 294 (2011) ("[T]he determination regarding the applicability of governmental immunity and a statutory exception to governmental immunity is a question of law . . . .").

16

Our decision in *Kolanek* supports this conclusion. There we explained that § 4 " 'grants qualifying patient[s]' who hold 'registry identification card[s]' broad immunity *from* criminal prosecution, civil penalties, and disciplinary actions."[39] A registered qualifying patient, however, "who do[es] not qualify for immunity under § 4, as well as unregistered persons, are entitled to assert *in* a criminal prosecution the affirmative defense . . . under § 8 . . . ."[40] By contrasting the broad grant of immunity in § 4 "*from* prosecution" with the affirmative defense in § 8 "*in* a criminal prosecution," we implied that the decision regarding entitlement to immunity must be made before trial. By its very nature, immunity must be decided by the trial court as a matter of law, and in pretrial proceedings, in order to establish immunity *from* prosecution.

Deciding these questions of law necessarily involves resolving factual disputes. To determine whether a defendant is entitled to the § 4 grant of immunity, the trial court must make factual determinations, including whether the defendant has a valid registry identification card and whether he or she complied with the volume, storage, and medical use limitations. The expediency of having the trial court resolve factual questions surrounding § 4 underscores the purpose of granting immunity *from* prosecution.

Other matters routinely conducted in pretrial contexts, such as entrapment hearings, call for the trial court to act as both the finder of fact and arbiter of law.[41] Like

---

[39] *Kolanek*, 491 Mich at 394-395 (emphasis added).

[40] *Id*. at 415 (emphasis added).

[41] See *People v Julliet*, 439 Mich 34, 61; 475 NW2d 786 (1991) (opinion by BRICKLEY, J.) (entrapment determined by trial court); *People v Jones*, 301 Mich App 566, 575-576; 837 NW2d 7 (2013) (discussing similarities between § 4 immunity hearings and entrapment hearings).

17

entrapment, § 4 immunity "is not a defense that negates an essential element of the charged crime. Instead, it presents facts that are collateral to the crime that justify barring the defendant's prosecution."[42] We therefore conclude that the trial court must resolve factual disputes for the purpose of determining § 4 immunity.

Of course, the trial court's determinations are not without review. Questions of law are reviewed de novo by appellate courts.[43] A trial court's factual findings are subject to appellate review under the clearly erroneous standard:

> Findings of fact by the trial court may not be set aside unless clearly erroneous. In the application of this principle, regard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it.[44]

We find no reason, nor have the parties offered any reason, to deviate from this model of appellate review. Therefore, we conclude that specific factual findings made by the trial court in a § 4 immunity hearing are reviewed under the clearly erroneous standard, and questions of law surrounding the grant or denial of § 4 immunity are reviewed de novo. Further, the trial court's ultimate grant or denial of immunity is fact-dependent and is reviewed for clear error.[45]

---

[42] *Julliet*, 439 Mich at 52 (opinion by BRICKLEY, J.).

[43] See *People v Keller*, 479 Mich 467, 473-474; 739 NW2d 505 (2007).

[44] MCR 2.613(C).

[45] See *People v Johnson*, 466 Mich 491, 497; 647 NW2d 480 (2002), citing *People v Jamieson*, 436 Mich 61, 80; 461 NW2d 884 (1990) (opinion by BRICKLEY, J.).

18

## 2.  SUBSTANTIVE ASPECTS OF § 4

Section 4 provides a broad grant of immunity from criminal prosecution and civil penalties to registered qualifying patients and connected primary caregivers.  As we have stated, the statute leaves much to be desired regarding the proper implementation of this grant of immunity.  When addressing this question, we must consider (a) the evidentiary burden required to establish immunity and the presumption of medical use under § 4, (b) the elements required to establish immunity and the presumption of medical use, and (c) what evidence may properly rebut a presumption of medical use.

### a.  BURDEN OF PROOF

The MMMA is silent regarding the burden of proof necessary for a defendant to be entitled to immunity under § 4.  When statutes are silent as to the burden of proof, "we are free to assign it as we see fit, as long as we do not transgress the constitutional requirement that we not place on the defendant the burden of persuasion to negate an element of the crime."[46]

Assigning the burden of proof involves two distinct legal concepts.  The first, the burden of production, requires a party to produce some evidence of that party's propositions of fact.[47]  The second, the burden of persuasion, requires a party to convince the trier of fact that those propositions of fact are true.[48]  The prosecution has the burden

---

[46] *People v Mezy*, 453 Mich 269, 283; 551 NW2d 389 (1996), citing *Patterson v New York*, 432 US 197; 97 S Ct 2319; 53 L Ed 2d 281 (1977).

[47] See McCormick, Evidence (7th ed), § 336, pp 644-645.

[48] *Id*.  Some courts have conflated the burden of proof with the burden of persuasion or the burden of production.  See *Director, Office of Workers' Comp Programs v Greenwich Collieries*, 512 US 267, 272-276; 114 S Ct 2251; 129 L Ed 2d 221 (1994) (referring to

19

of proving every element of a charged crime beyond a reasonable doubt.[49]  This rule of law exists in part to ensure that "there is a presumption of innocence in favor of the accused . . . and its enforcement lies at the foundation of the administration of our criminal law."[50]  To place the burden on a criminal defendant to negate a specific element of a crime would clearly run afoul of this axiomatic, elementary, and undoubted principle of law.[51]

A defendant invoking § 4 immunity, however, does so without regard to any presumption of innocence.  The defendant does not dispute any element of the underlying charge when claiming immunity.  Indeed, the defendant may even admit to otherwise unlawful conduct and yet still be entitled to § 4 immunity.  When claiming § 4 immunity, the defendant places himself in an offensive position, affirmatively arguing entitlement to § 4 immunity without regard to his or her underlying guilt or innocence of the crime charged.  In *People v D'Angelo*, we determined that the accusatorial nature of a defendant's request for a defense of entrapment, without regard to his or her guilt or innocence of the underlying criminal charge, required the burden of proof by a

---

the "burden of proof" as the "burden of persuasion").  But these are different concepts.  The burden of proof, which may also be generally referred to as a party's evidentiary burden, refers both to a party's burden to provide actual evidence of alleged facts and a party's burden to persuade the trier of fact as to the veracity of those facts.

[49] See *People v Crawford*, 458 Mich 376, 389; 582 NW2d 785 (1998) ("[T]he prosecution must carry the burden of proving every element beyond a reasonable doubt . . . .").

[50] *Coffin v United States*, 156 US 432, 453; 15 S Ct 394; 39 L Ed 481 (1895).

[51] *Id*.

20

preponderance of the evidence to be allocated to the defendant.[52] The accusatorial nature of an entrapment defense and the offensive nature of immunity are similar because in both the defendant posits an affirmative argument, rather than defending a particular charge. We now follow this well-established rule of criminal procedure and assign to the defendant the burden of proving § 4 immunity by a preponderance of the evidence.

### b. ELEMENTS REQUIRED TO ESTABLISH IMMUNITY

A defendant may claim entitlement to immunity for any or all charged offenses. Once a claim of immunity is made, the trial court must conduct an evidentiary hearing to factually determine whether, for each claim of immunity, the defendant has proved each element required for immunity. These elements consist of whether, at the time of the charged offense, the defendant:

> (1) was issued and possessed a valid registry identification card,
>
> (2) complied with the requisite volume limitations of § 4(a) and § 4(b),
>
> (3) stored any marijuana plants in an enclosed, locked facility, and
>
> (4) was engaged in the medical use of marijuana.[53]

The court must examine the first element of immunity—possession of a valid registry identification card—on a charge-by-charge basis. In most cases, satisfying the first element will be an all-or-nothing proposition. A qualifying patient or primary caregiver who does not have a valid registry identification card is not entitled to immunity because the first element required for immunity cannot be satisfied.

---

[52] *People v D'Angelo*, 401 Mich 167, 180, 183; 257 NW2d 655 (1977).

[53] MCL 333.26424(a)-(b).

Conversely, a qualifying patient or primary caregiver satisfies the first element of immunity if he or she possessed a valid registry identification card at all times relevant to the charged offenses. In some cases, there may be a gap between a qualifying patient's or a primary caregiver's earliest conduct underlying the charged offenses and his or her most recent conduct. A court must pay special attention to whether the effective date or expiration date of a registry identification card occurred within this gap and determine whether the conduct occurred when the patient or caregiver possessed a valid registry identification card. A qualifying patient or primary caregiver can only satisfy the first element of immunity for any charge if all conduct underlying that charge occurred during a time when the qualifying patient or primary caregiver possessed a valid registry identification card.

Generally, the second and third elements of immunity are also all-or-nothing propositions. The second element—the volume limitations of § 4(a) and § 4(b)—requires that the qualifying patient or primary caregiver be in possession of no more than a specified amount of usable marijuana and a specified number of marijuana plants. When a primary caregiver is connected with one or more qualifying patients, the amount of usable marijuana and the number of plants is calculated in the aggregate—2.5 ounces of usable marijuana and 12 marijuana plants for each qualifying patient, including the caregiver if he or she is also a registered qualifying patient acting as his or her own caregiver.[54] When a qualifying patient cultivates his or her own marijuana for medical

---

[54] For example, a registered qualifying patient who is his or her own caregiver and the caregiver to five other qualifying patients is allowed to possess up to 72 marijuana plants and up to 15 ounces of usable marijuana. If that individual actually possessed 73

use and is not connected with a caregiver, the patient is limited to 2.5 ounces of usable marijuana and 12 marijuana plants. A qualifying patient or primary caregiver in possession of more marijuana than allowed under § 4(a) and § 4(b) at the time of the charged offense cannot satisfy the second element of immunity.

The third element of § 4 immunity requires all marijuana plants possessed by a qualifying patient or primary caregiver to be kept in an enclosed, locked facility. Thus, a qualifying patient or primary caregiver whose marijuana plants are not kept in an enclosed, locked facility at the time of the charged offense cannot satisfy the third element and cannot receive immunity for the charged offense.

The fourth element conditions immunity on the "medical use" of marijuana, as defined in § 3(f). Unlike elements two and three, the fourth element does not depend on the defendant's aggregate conduct. Instead, this element depends on whether the conduct forming the basis of each particular criminal charge involved "the acquisition, possession, cultivation, manufacture, use, internal possession, delivery, transfer, or transportation of marihuana or paraphernalia relating to the administration of marihuana to treat or alleviate a registered qualifying patient's debilitating medical condition or symptoms associated with the debilitating medical condition."[55] Whether a qualifying patient or primary caregiver was engaged in the medical use of marijuana must be determined on a charge-by-charge basis.

marijuana plants or 16 ounces of usable marijuana and was charged with multiple marijuana-related offenses, the individual could not satisfy the second element of immunity under § 4 for any of the charged offenses because the individual possessed marijuana in excess of the volume limitations in § 4(a) and § 4(b).

[55] MCL 333.26423(f).

While the qualifying patient or primary caregiver retains the burden of proving this fourth and last element of immunity, § 4(d) of the MMMA creates a rebuttable presumption of medical use when the qualifying patient or primary caregiver satisfies certain requirements.

> (d) There shall be a presumption that a qualifying patient or primary caregiver is engaged in the medical use of marihuana in accordance with this act if the qualifying patient or primary caregiver:
>
> (1) is in possession of a registry identification card; and
>
> (2) is in possession of an amount of marihuana that does not exceed the amount allowed under this act. The presumption [that one is engaged in the medical use of marihuana] may be rebutted by evidence that conduct related to marihuana was not for the purpose of alleviating the qualifying patient's debilitating medical condition or symptoms associated with the debilitating medical condition, in accordance with this act.[56]

The requirements necessary to establish the presumption of medical use mirror the first two elements required to establish immunity. Therefore, a qualifying patient or primary caregiver is entitled to the presumption of medical use in § 4(d) simply by establishing the first two elements of § 4 immunity.[57]

In sum, a qualifying patient seeking to assert the protections of § 4 must prove four elements by a preponderance of the evidence. A qualifying patient must prove that, at the time of the charged offense, he or she (1) possessed a valid registry identification card; (2) possessed no more marijuana than allowed under § 4(a); (3) stored any

---

[56] MCL 333.26424(d).

[57] These elements are (1) possessing a valid registry identification card, and (2) complying with the volume limitations of § 4(a) and § 4(b).

24

marijuana plants in an enclosed, locked facility; and (4) was engaged in the medical use of marijuana. If the qualifying patient establishes the first and second elements, then a presumption exists that the qualifying patient was engaged in the medical use of marijuana, thereby establishing the fourth element.

Similarly, a primary caregiver seeking to assert the protections of § 4 must prove four elements by a preponderance of the evidence. A primary caregiver must prove that, at the time of the charged offense, he or she (1) possessed a valid registry identification card; (2) possessed no more marijuana than allowed under § 4(b); (3) stored any marijuana plants in an enclosed, locked facility; and (4) was assisting connected qualifying patients with the medical use of marijuana. If the primary caregiver establishes the first and second elements, then a presumption exists that the primary caregiver was engaged in the medical use of marijuana, thereby establishing the fourth element.

## c. REBUTTING THE PRESUMPTION

The presumption of the medical use of marijuana is a powerful tool for a defendant in asserting § 4 immunity. But this presumption is rebuttable:

> The presumption [that one is engaged in the medical use of marihuana] may be rebutted by evidence that conduct related to marihuana was not for the purpose of alleviating the qualifying patient's debilitating medical condition or symptoms associated with the debilitating medical condition, in accordance with this act.[58]

---

[58] MCL 333.26424(d)(2).

According to § 4(d)(2), the presumption of the medical use of marijuana may be rebutted by examining "conduct related to marihuana . . . ." While the statute does not specifically state whose marijuana-related conduct may be used, when read in context it is clear that it refers to the defendant's conduct. Stated differently, in § 4(d), only the defendant's conduct may be considered to rebut the presumption of the medical use of marijuana. This interpretation is consistent with the purpose of § 4, which is to provide immunity from prosecution to a defendant who abides by certain restrictions.

For this reason, we hold that the prosecution may not rebut a primary caregiver's presumption of medical use by introducing evidence of conduct unrelated to the primary caregiver,[59] such as evidence that a connected qualifying patient does not actually have a debilitating medical condition or evidence that a connected qualifying patient used marijuana for nonmedical purposes. Similarly, the prosecution may not rebut a qualifying patient's presumption of medical use by introducing evidence that the connected primary caregiver used the qualifying patient's marijuana for nonmedical purposes.[60]

---

[59] We recognize that "conduct" may be misfeasance as well as nonfeasance. Nothing in our holding should be interpreted to shield a primary caregiver who has actual knowledge that the marijuana provided to a qualifying patient is being used in a manner not permitted under the MMMA.

[60] The MMMA requires the state to verify all information contained in an application for a registry identification card and to keep confidential the list of registry identification cards issued, except to verify the validity of such cards to law enforcement. Hartwick and Tuttle both argue that because of the verification and confidentiality requirements, the issuance of a registry identification card establishes either immunity under § 4 or, at least, a presumption of the medical use of marijuana under § 4(d). As we have already concluded, a registry identification card is only one requirement for establishing immunity under § 4. The verification and confidentiality provisions do not establish that

26

We must also determine whether one or more transactions that are outside the scope of the MMMA may rebut the presumption of medical use for otherwise-compliant MMMA conduct. As noted § 4(d)(2) provides the prosecution with the ability to rebut this presumption.[61]

In *Tuttle*, the Court of Appeals held that a noncompliant marijuana transaction negates a defendant's ability to claim § 4 immunity as to the defendant's entire marijuana-related conduct. The court determined that "§ 4 does not allow [a] defendant to decouple . . . illicit actions involving marijuana from . . . other[wise MMMA-compliant] marijuana-related activities . . . ."[62] The court concluded that illicit marijuana-related conduct rebuts the § 4(d) presumption of medical use for otherwise MMMA-compliant conduct.[63]

The prosecution agrees with the Court of Appeals, arguing that if a primary caregiver has provided marijuana to an unconnected individual, the presumption of medical use has been rebutted for all of the primary caregiver's marijuana-related conduct, including conduct that otherwise complies with § 4. Therefore, according to the prosecution, any unprotected marijuana-related conduct rebuts a defendant's presumption

---

a defendant has engaged in the medical use of marijuana or abided by the requisite volume and storage limitations of § 4(a) and § (4)(b). Simply put, a registry identification card, alone, does not establish § 4 immunity or a presumption of the medical use of marijuana under § 4(d).

[61] MCL 333.26424(d)(2).

[62] *Tuttle*, 304 Mich App at 84.

[63] *Id.*

27

of medical use for all of the defendant's marijuana-related conduct, regardless of its relevance to the charged offense.

Tuttle argues that unprotected marijuana-related conduct may only rebut the presumption as to otherwise protected conduct if a nexus exists between the unprotected conduct and the protected conduct. In *Tuttle*, counts I-III relate to unprotected transfers of marijuana from Tuttle to an unconnected patient. Tuttle agrees that this conduct is not protected and that there is no § 4 immunity with regard to that conduct. Counts IV-VII, however, relate to the marijuana being manufactured in Tuttle's home. Tuttle argues that the conduct in counts I-III does not necessarily affect the conduct underlying counts IV-VII.

Tuttle specifically stresses that § 4(d)(2) provides that the presumption of medical use "may" be rebutted. Tuttle relies on the word "may" for the proposition that the trial court in its fact-finding capacity may either reject or accept evidence presented by the prosecution. Therefore, Tuttle claims, the trial court is not obligated to accept evidence of an unrelated and unprotected transaction to rebut the presumption of medical use for an otherwise protected transaction.

It is clear, as Tuttle concedes, that conduct violating the MMMA directly rebuts the presumption of medical use when a defendant's charges are based on that specific conduct (such as the illicit conduct on which counts I-III against Tuttle are based). It is not clear, however, that conduct violating the MMMA would also rebut the presumption of medical use related to other charges against the defendant when the illicit conduct does not form the basis of charges (such as the otherwise MMMA-compliant conduct on which counts IV-VII against Tuttle are based). While the statutory language is neither

28

compelling nor expressly direct, we nonetheless conclude that the statutory text lends support for Tuttle's proposition.

Use of the permissive "may," in conjunction with the trial court's general gatekeeping responsibility to admit only relevant evidence,[64] leads us to conclude that to rebut the presumption of medical use the prosecution's rebuttal evidence must be relevant, such that the illicit conduct would allow the fact-finder to conclude that the otherwise MMMA-compliant conduct was not for the medical use of marijuana. In other words, the illicit conduct and the otherwise MMMA-compliant conduct must have a nexus to one another in order to rebut the § 4(d) presumption. This is consistent with the conclusions that the fourth element of immunity—medical use—is dependent only on the conduct forming the basis for each particular criminal charge and that immunity is claimed and generally proved on a charge-by-charge basis.

Further, Tuttle's view not only has statutory support, but also comports with how generally a presumption should be rebutted. Only relevant evidence that allows the fact-finder to conclude that the underlying conduct was not for "medical use" may rebut the § 4(d) presumption. A wholly unrelated transaction—i.e., a transaction with no nexus, and therefore no relevance, to the conduct resulting in the charged offense—does not assist the fact-finder in determining whether the defendant actually was engaged in the medical use of marijuana during the charged offense. Conduct unrelated to the charged offense is irrelevant and does not rebut the presumption of medical use.

---

[64] See MRE 401 and MRE 402.

29

Therefore, under § 4(d)(2), the prosecution may rebut the presumption of medical use for each claim of immunity. Improper conduct related to one charged offense may not be imputed to another charged offense unless the prosecution can establish a nexus between the improper conduct and the otherwise MMMA-compliant conduct. The trial court must ultimately determine whether a defendant has established by a preponderance of the evidence that he or she was engaged in the medical use of marijuana. The defendant may do so by establishing this powerful presumption of medical use. If the presumption of medical use has been rebutted, however, the defendant may still prove through other evidence that, with regard to the underlying conduct that resulted in the charged offense and for which the defendant claims immunity, the defendant was engaged in the medical use of marijuana, as defined in § 3(f).

## C. SECTION 8 DEFENSE

Section 8(a) of the MMMA provides any patient or primary caregiver—regardless of registration with the state—with the ability to assert an affirmative defense to a marijuana-related offense. The affirmative defense "shall be presumed valid where the evidence shows":

> (1) A physician has stated that, in the physician's professional opinion, after having completed a full assessment of the patient's medical history and current medical condition made in the course of a bona fide physician-patient relationship, the patient is likely to receive therapeutic or palliative benefit from the medical use of marihuana to treat or alleviate the patient's serious or debilitating medical condition or symptoms of the patient's serious or debilitating medical condition;

> (2) The patient and the patient's primary caregiver, if any, were collectively in possession of a quantity of marihuana that was not more than was reasonably necessary to ensure the uninterrupted availability of marihuana for the purpose of treating or alleviating the patient's serious or

30

debilitating medical condition or symptoms of the patient's serious or debilitating medical condition; and

(3) The patient and the patient's primary caregiver, if any, were engaged in the acquisition, possession, cultivation, manufacture, use, delivery, transfer, or transportation of marihuana or paraphernalia relating to the use of marihuana to treat or alleviate the patient's serious or debilitating medical condition or symptoms of the patient's serious or debilitating medical condition.[65]

In *Kolanek*, we determined that if a defendant establishes these elements and no question of fact exists regarding these elements, then the defendant is entitled to dismissal of the criminal charges.[66] We also clarified that if questions of fact exist, then "dismissal of the charges is not appropriate and the defense must be submitted to the jury."[67] Additionally, if a defendant has not presented prima facie evidence of each element of § 8 by "present[ing] evidence from which a reasonable jury could conclude that the defendant satisfied the elements of the § 8 affirmative defense, . . . then the circuit court must deny the motion to dismiss the charges," and "the defendant is not permitted to present the § 8 defense to the jury."[68]

A defendant seeking to assert the MMMA's statutory affirmative defense must present prima facie evidence for each element of § 8(a).[69] Overcoming this initial hurdle

---

[65] MCL 333.26428(a)(1)-(3).

[66] *Kolanek*, 491 Mich at 416.

[67] *Id.*

[68] *Id.*

[69] *Id.* at 415-416. In *Kolanek*, we did not determine the standard by which a defendant must establish a § 8 defense. We now clarify that well-established rules of criminal procedure require a defendant to prove the affirmative defense by a preponderance of evidence. See, e.g., *D'Angelo*, 401 Mich at 183 (holding that the defendant has the

31

of presenting prima facie evidence of each element is not an easy task. The elements of § 8 are clearly more onerous than the elements of § 4. The statutory scheme of the MMMA is designed to benefit those who properly register and are meticulous in their adherence to the law. Presumably, a properly registered defendant facing criminal charges would invoke immunity under § 4. However, a § 8 defense may be pursued by any defendant, regardless of registration status. With this background, we consider each element of the § 8 affirmative defense.

### 1. SECTION 8(A)(1): THE IMPRIMATUR OF THE PHYSICIAN-PATIENT RELATIONSHIP

Section 8(a)(1) requires a physician to determine the patient's suitability for the medical use of marijuana. It provides:

> (1) A physician has stated that, in the physician's professional opinion, after having completed a full assessment of the patient's medical history and current medical condition made in the course of a bona fide physician-patient relationship, the patient is likely to receive therapeutic or palliative benefit from the medical use of marihuana to treat or alleviate the patient's serious or debilitating medical condition or symptoms of the patient's serious or debilitating medical condition[.][70]

This provision may be reduced to three elements:

(1) The existence of a bona fide physician-patient relationship,

(2) in which the physician completes a full assessment of the patient's medical history and current medical condition, and

---

burden of proving entrapment by a preponderance of the evidence). Thus, when the § 8 affirmative defense is submitted to a fact-finder, the defendant's burden of proof is to establish the elements of § 8(a) by a preponderance of the evidence.

[70] MCL 333.26428(a)(1).

(3) from which results the physician's professional opinion that the patient has a debilitating medical condition and will likely benefit from the medical use of marijuana to treat the debilitating medical condition.

Each of these elements must be proved in order to establish the imprimatur of the physician-patient relationship required under § 8(a)(1) of the MMMA. Hartwick and Tuttle argue that the registry identification card establishes these three elements. We do not find merit in this position.

As part of the process for obtaining a registry identification card, an applicant must submit, among other materials, a "written certification."[71] At the time of the offenses at issue,[72] the MMMA defined a written certification as:

> [A] document signed by a physician, stating the patient's debilitating medical condition and stating that, in the physician's professional opinion, the patient is likely to receive therapeutic or palliative benefit from the medical use of marihuana to treat or alleviate the patient's debilitating medical condition or symptoms associated with the debilitating medical condition.[73]

Thus, at the time of the offenses at issue, a written certification was a document prepared by a physician that contained at least two representations: (1) the patient has a debilitating medical condition, and (2) the patient will likely benefit from the medical use of marijuana. Further, MCL 333.26426(c) provides that the department "shall verify the

---

[71] MCL 333.26426(a)(1).

[72] In 2012, the Legislature garnered sufficient votes to satisfy the three-fourths super majority required to amend a voter-enacted initiative and amended the MMMA to include the additional requirement that the physician conducted a full, in-person assessment of the patient. See 2012 PA 512, effective April 1, 2013.

[73] Former MCL 333.26423(*l*). "Written certification" has since been amended and renumbered as § 3(m). See 2012 PA 512, effective April 1, 2013.

33

information contained in an application" and that the department "may deny an application . . . only if the applicant did not provide the information required pursuant to this section, or if the department determines that the information provided was falsified."

Comparing the definition of "written certification" with the elements of § 8(a)(1), a registry identification card satisfies the third element (the patient has a debilitating medical condition and would likely benefit from the medical use of marijuana). A registry identification card, however, does not establish the second element (a physician has completed a full assessment of the patient's medical history and current medical condition).[74] The second element must be established through medical records or other evidence submitted to show that the physician actually completed a full assessment of the patient's medical history and current medical condition before concluding that the patient is likely to benefit from the medical use of marijuana and before the patient engages in the medical use of marijuana. Additionally, the physician certification leaves unsatisfied the first element of § 8(a)(1) (the existence of a bona fide physician-patient relationship).

At the time of the offenses at issue, the MMMA did not define "bona fide physician-patient relationship."[75] In *Kolanek*, we stated that "this term envisions 'a pre-

---

[74] We note that registry identification cards issued on or after April 1, 2013, the effective date of 2012 PA 512, establish the second element. See note 72 of this opinion.

[75] The MMMA has since been amended by 2012 PA 512, effective April 1, 2013, to define a "bona fide physician-patient relationship."

> "Bona fide physician-patient relationship" means a treatment or counseling relationship between a physician and patient in which all of the following are present:
>
> (1) The physician has reviewed the patient's relevant medical records and completed a full assessment of the patient's medical history

34

existing and ongoing relationship with the patient as a treating physician.' "[76] Thus, to satisfy the first element—the existence of a bona fide physician-patient relationship—there must be proof of an actual and ongoing physician-patient relationship at the time the written certification was issued.[77]

---

and current medical condition, including a relevant, in-person, medical evaluation of the patient.

(2) The physician has created and maintained records of the patient's condition in accord with medically accepted standards.

(3) The physician has a reasonable expectation that he or she will provide follow-up care to the patient to monitor the efficacy of the use of medical marihuana as a treatment of the patient's debilitating medical condition.

(4) If the patient has given permission, the physician has notified the patient's primary care physician of the patient's debilitating medical condition and certification for the use of medical marihuana to treat that condition. [MCL 333.26423(a).]

[76] *Kolanek*, 491 Mich at 396 n 30 (quoting a joint statement by the Michigan Board of Medicine and the Michigan Board of Osteopathic Medicine and Surgery).

[77] We acknowledge that the actual text of the physician's statement submitted as part of the registration process might suffice. Although hearsay, the physician's written certification is a "report of . . . occurrences, events, conditions, opinions, or diagnoses, made at or near the time by . . . a person with knowledge [that is] kept in the course of a regularly conducted business activity [and is a] regular practice of that business activity to make . . . ." MRE 803(6). That physicians are required by statute to prepare a certificate to recommend the medical use of marijuana tends to establish that the certificate is prepared in regular practice. Moreover, nothing prevents a physician from including a statement in the written certificate indicating that it was prepared in the course of a bona fide physician-patient relationship or indicating the physician's recommendation as to the particular amount of marijuana. Likewise, nothing prevents the department from revising the physician certification to attest to these elements. Nor does anything prevent another individual from creating his or her own written certification acceptable to the department. Accordingly, the written certification could itself provide prima facie evidence of the elements of § 8(a). Further, a defendant may

A primary caregiver has the burden of establishing the elements of § 8(a)(1) for each patient to whom the primary caregiver is alleged to have unlawfully provided marijuana. In this context, a primary caregiver who provides marijuana to a putative patient plainly assumes the risk that the patient does not actually meet the elements of § 8(a)(1) or that the patient may not cooperate in a subsequent prosecution of the primary caregiver, regardless what that person may have otherwise told the primary caregiver.[78]

## 2. SECTION 8(a)(2): THE QUANTITY OF MARIJUANA

Section 8(a)(2) requires a patient or primary caregiver to show:

> The patient and the patient's primary caregiver, if any, were collectively in possession of a quantity of marihuana that was not more than was reasonably necessary to ensure the uninterrupted availability of marihuana for the purpose of treating or alleviating the patient's serious or debilitating medical condition or symptoms of the patient's serious or debilitating medical condition[.][79]

---

present patient testimony or other evidence to satisfy his or her burden of presenting prima facie evidence of the elements of § 8(a). A defendant who submits proper evidence would not likely need his or her physician to testify to establish prima facie evidence of any element of § 8(a).

[78] Because "[p]ossession, manufacture, and delivery of marijuana remain punishable offenses under Michigan law," *Kolanek*, 491 Mich at 394, a caregiver-defendant's patient might be unwilling to testify to the patient's marijuana-related activities due to fear of criminal prosecution. This would present a significant barrier to the caregiver's ability to establish a defense under § 8. And because a witness cannot be compelled to give testimony that the witness reasonably believes could be used against him or her in a criminal prosecution, a patient's justified refusal to cooperate might prove fatal to the primary caregiver's § 8 defense. See *Hoffman v United States*, 341 US 479, 486; 71 S Ct 814; 95 L Ed 1118 (1951) ("It is for the court to say whether [the witness's] silence is justified."). While this may seem a harsh consequence, this Court has no power to alter the statutory language.

[79] MCL 333.26428(a)(2).

36

The critical phrase from the above quoted passage is "reasonably necessary to ensure uninterrupted availability of marihuana [for treatment] . . . ." Hartwick and Tuttle maintain that a registry identification card establishes a presumption that any amount of marijuana possessed by a defendant is a reasonable amount of marijuana under the MMMA. In the alternative, they argue that a valid registry identification card, coupled with compliance with the volume limitations in § 4, establishes a presumption that the amount of marijuana possessed is reasonable. Again, we do not find support for the defendants' position in the text of the MMMA.

The issuance of a registry identification card or compliance with the volume limitations in § 4 does not show that an individual possesses only a "reasonably necessary" amount of marijuana "to ensure uninterrupted availability" for the purposes of § 8(a)(2). A registry identification card simply qualifies a patient for the medical use of marijuana. It does not guarantee that an individual will always possess only the amount of marijuana allowed under the MMMA.

Further, nothing in the MMMA supports the notion that the quantity limits found in the immunity provision of § 4 should be judicially imposed on the affirmative defense provision of § 8. Sections 4 and 8 feature contrasting statutory language intended to serve two very different purposes.[80] Section 4 creates a specific volume limitation applicable to those seeking immunity. In contrast, § 8 leaves open the volume limitation to that which is "reasonably necessary." The MMMA could have specified a specific

---

[80] Section 4 grants broad immunity *from* arrest or prosecution, while § 8 provides for an affirmative defense *during* a prosecution.

37

volume limitation in § 8, but it did not. In the absence of such an express limitation, we will not judicially assign to § 8 the volume limitation in § 4 to create a presumption of compliance with § 8(a)(2). Indeed, the only instance in which a primary caregiver must control a patient's dosage is when he or she is the parent of a minor patient.[81] That the statute requires these particular caregivers to control a patient's dosage, but does not require it of others, indicates that all other caregivers need not be particularly aware of their patients' medical needs. Instead, a primary caregiver may reasonably rely on the amount his or her patient states is needed to treat the patient's debilitating medical condition.

A patient seeking to assert a § 8 affirmative defense may have to testify about whether a specific amount of marijuana alleviated the debilitating medical condition and if not, what adjustments were made to the consumption rate and the amount of marijuana consumed to determine an appropriate quantity. Once the patient establishes the amount of usable marijuana needed to treat the patient's debilitating medical condition, determining whether the patient possessed "a quantity of marihuana that was not more than was reasonably necessary to ensure [its] uninterrupted availability" also depends on how the patient obtains marijuana and the reliability of this source. This would necessitate some examination of the patient/caregiver relationship.

The same analysis applies to primary caregivers seeking to present a defense under § 8. Primary caregivers must establish the amount of usable marijuana needed to treat their patients' debilitating medical conditions and then how many marijuana plants the

---

[81] MCL 333.26426(b)(3)(C).

primary caregiver needs to grow in order ensure "uninterrupted availability" for the caregiver's patients. This likely would include testimony regarding how much usable marijuana each patient required and how many marijuana plants and how much usable marijuana the primary caregiver needed in order to ensure each patient the "uninterrupted availability" of marijuana.

3. SECTION 8(a)(3): THE USE OF MARIJUANA FOR A MEDICAL PURPOSE

Section 8(a)(3) requires a patient or primary caregiver to show:

> The patient and the patient's primary caregiver, if any, were engaged in the acquisition, possession, cultivation, manufacture, use, delivery, transfer, or transportation of marihuana or paraphernalia relating to the use of marihuana to treat or alleviate the patient's serious or debilitating medical condition or symptoms of the patient's serious or debilitating medical condition. [82]

Although there is a purposeful distinction made between the amount of marijuana permitted under § 4 and the "reasonably necessary" restraint on quantity found in § 8(a)(2), § 8(a)(3) requires a patient and primary caregiver to show that any marijuana use complied with a very similar "medical use" requirement found in § 4, and defined in § 3:

> "Medical use" means the acquisition, possession, cultivation, manufacture, use, internal possession, delivery, transfer, or transportation of marihuana or paraphernalia relating to the administration of marihuana to treat or alleviate a registered qualifying patient's debilitating medical condition or symptoms associated with the debilitating medical condition.[83]

---

[82] MCL 333.26428(a)(3).

[83] MCL 333.26423(f).

The slight variance between the definition of "medical use" in § 4 and medical use as it appears in § 8 can be attributed to the fact that only registered qualifying patients and registered primary caregivers may engage in the "medical use" of marijuana, as indicated by use of the term in § 4.[84] Those patients and primary caregivers who are not registered may still be entitled to § 8 protections if they can show that their use of marijuana was for a medical purpose—to treat or alleviate a serious or debilitating medical condition or its symptoms. Hartwick and Tuttle again argue that a registry identification card alone, or a registry identification card coupled with compliance with either the volume limitations of § 4(a) and (4)(b) or § 8(a)(2), satisfies § 8(a)(3). Once again, defendants seek to attribute greater significance to the registry identification card than that which is expressly provided in the MMMA. We simply do not find support for the defendants' arguments in the text of the MMMA.

A registry identification card merely qualifies a patient for the medical use of marijuana. It does not establish that at the time of the charged offense, the defendant was actually engaged in the protected use of marijuana. Section 8(a)(3) requires that both the patient's and the primary caregiver's use of marijuana be for a medical purpose, and that their conduct be described by the language in § 8(a)(3). Thus, patients must present prima facie evidence regarding their use of marijuana for a medical purpose regardless whether they possess a registry identification card. Primary caregivers would also have

_____

[84] The definition in § 4 includes "internal possession" and specifies that the patient is a registered qualifying patient. The permitted uses in § 8 do not include "internal possession," and the requirements apply to "patients" who are not necessarily registered.

40

to present prima facie evidence of their own use of marijuana for a medical purpose and any patients' use of marijuana for a medical purpose.

### III. APPLICATION TO *HARTWICK* AND *TUTTLE*

### A. *PEOPLE V HARTWICK*

### 1. SECTION 4 IMMUNITY

Hartwick is a registered qualifying patient, his own caregiver, and at all times pertinent to this dispute, a primary caregiver to five registered qualifying patients. The prosecuting attorney charged Hartwick with manufacturing marijuana and possession of marijuana with the intent to deliver. Hartwick sought to invoke § 4 immunity. In order to qualify for § 4 immunity, Hartwick must prove by a preponderance of the evidence that for each charged offense he

> (1) possessed a valid registry identification card for himself as a qualifying patient and for each of the five other connected registered qualifying patients,

> (2) possessed no more than 72 marijuana plants and 15 ounces of usable marijuana,[85]

> (3) kept the marijuana plants in an enclosed, locked facility, and

> (4) was engaged in the medical use of marijuana.

Hartwick is entitled to a presumption of the medical use of marijuana if he shows by a preponderance of the evidence that he possessed:

---

[85] As a registered qualifying patient, Hartwick may possess up to 12 marijuana plants and 2.5 ounces of usable marijuana. As a primary caregiver, Hartwick may possess up to 12 marijuana plants and 2.5 ounces of usable marijuana for each connected registered qualifying patient.

> (1) a valid registry identification card for himself as a patient and for each of the five other registered qualifying patients to whom he is connected under the MMMA, and

> (2) no more than 72 marijuana plants and 15 ounces of usable marijuana.

The prosecution may then rebut this presumption in accordance with § 4(d)(2).

The lower courts erred with respect to Hartwick's entitlement to immunity under § 4. There is no statutory requirement under § 4 that Hartwick know the debilitating conditions of, the amount of marijuana needed for, the length of time treatment should continue for, or the identities of the physicians of, the registered qualifying patients to whom Hartwick is connected under the MMMA. This lack of information cannot be used to rebut Hartwick's presumption of the medical use of marijuana under § 4(d). For purposes of § 4, the lower courts should have instead focused on Hartwick's conduct.

The Court of Appeals also should not have determined that the number of marijuana plants Hartwick possessed was "moot."[86] The trial court never made a factual determination of the number of marijuana plants in Hartwick's possession or the other elements of § 4. Even if such facts had been established, the Court of Appeals reviews the trial court's factual findings for clear error. Thus, a new § 4 evidentiary hearing conforming to the holdings expressed in this opinion is necessary to determine Hartwick's entitlement to § 4 immunity.

---

[86] *Hartwick*, 303 Mich App at 259.

## 2. SECTION 8 DEFENSE

In contrast to Hartwick's claim of immunity under § 4, the lower courts correctly concluded that Hartwick was not entitled to the § 8 affirmative defense. Even though Hartwick provided testimony of his own medical condition and evidence of registry identification cards for himself and five patients, he did not present prima facie evidence for each element of § 8(a). Specifically, Hartwick failed to provide any evidence of § 8(a)(1) (bona fide physician-patient relationship), § 8(a)(2) (amount of marijuana the patients needed), or § 8(a)(3) (whether the patients engaged in the use of marijuana for a medical purpose).

Further, to the extent the Court of Appeals determined that a written certification was comparable to a pharmaceutical prescription, this determination was erroneous. A written certification is not similar to that of a pharmaceutical prescription. Marijuana is a Schedule 1 controlled substance.[87] Therefore, a doctor is not legally able to prescribe marijuana to an individual for any reason. A written certification is a statutorily mandated document that must meet specific statutory requirements so that an individual may successfully apply for a registry identification card. While the MMMA states that "[m]odern medical research . . . has discovered beneficial uses for marihuana in treating . . . debilitating medical conditions,"[88] the terminology employed in the MMMA and the actual function of primary caregivers and patients is not comparable to how a

---

[87] See MCL 333.7212(c).

[88] MCL 333.26422(a).

medical doctor's treatment of an actual patient. Primary caregivers carry out a statutorily created task that is completely unrelated to how a doctor would treat a patient.

## B. *PEOPLE V TUTTLE*

### 1. SECTION 4 IMMUNITY

Tuttle is a registered qualifying patient, his own caregiver, and a primary caregiver to at least one registered qualifying patient. The prosecuting attorney charged Tuttle with multiple counts of manufacturing, possessing, and delivering marijuana. Tuttle sought to have counts IV-VII, which relate to the manufacture and possession of marijuana in Tuttle's home, dismissed under the immunity provisions of § 4.

In order to qualify for immunity under § 4, Tuttle must prove by a preponderance of the evidence that for each charged offense he:

> (1) possessed a valid registry identification card for himself as a qualifying patient and for each connected registered qualifying patient,

> (2) possessed no more than the volume of marijuana permitted by § 4(a) and § 4(b),[89]

> (3) kept the marijuana plants in an enclosed, locked facility, and

> (4) was engaged in the medical use of marijuana.

---

[89] It is unclear in the record exactly how many qualifying patients Tuttle was connected to under the MMMA. Without that information, we are unable to determine how many marijuana plants and how much usable marijuana Tuttle was allowed to possess under § 4(a) and § 4(b). If Tuttle was his own caregiver and the primary caregiver to two other qualifying patients, then Tuttle would be permitted to possess no more than a total of 36 marijuana plants. Under those facts Tuttle would not be entitled to § 4 immunity for any charged offense if he possessed more than 36 marijuana plants.

Tuttle is entitled to a presumption that he was engaged in the medical use of marijuana if he shows by a preponderance of the evidence that he possessed:

> (1) a valid registry identification card for himself as a patient and for each connected registered qualifying patient, and

> (2) no more than the volume of marijuana allowed by § 4(a) and § 4(b).

The prosecution may then rebut this presumption in accordance with § 4(d)(2).

The lower courts erred when they concluded that Tuttle's provision of marijuana to Lalonde necessarily tainted all of Tuttle's marijuana-related activity thereby negating his ability to claim § 4 immunity for each charged offense. Providing marijuana to Lalonde did not per se taint all of Tuttle's marijuana-related conduct. Tuttle was not connected to Lalonde under the MMMA. Therefore, Tuttle was clearly outside the parameters of § 4 when he provided marijuana to Lalonde (counts I-III).

Tuttle, however, may still be entitled to immunity for the remaining charges in counts IV-VII. With regard to the charges of possessing and manufacturing marijuana in his home, the trial court must make factual determinations regarding the number of patients connected to Tuttle under the MMMA, the number of marijuana plants Tuttle had in his home and the amount of usable marijuana Tuttle possessed,[90] whether the marijuana plants were stored in an enclosed, locked facility, and whether Tuttle was engaged in the medical use of marijuana.

---

[90] Subject to the exclusion of "any incidental amount of seeds, stalks, [or] unusable roots . . . ." MCL 333.26424(4)(a) and (4)(b)(3).

Tuttle must prove entitlement to immunity for each charged offense. And the prosecution may only use evidence of conduct relating to one charged offense to rebut the presumption of medical use for another charged offense if a nexus exists between the charged offenses. Put simply, improper conduct related to Lalonde in counts I-III may only affect counts IV-VII if the prosecution can establish a nexus between the improper conduct in counts I-III and the otherwise MMMA-compliant conduct in counts IV-VII. Only if this nexus exists can the trial court determine that the illicit conduct in counts I-III rebuts the presumption that Tuttle was engaged in the medical use of marijuana for the conduct underlying counts IV-VII.

The trial court must ultimately weigh the evidence to determine if the prosecution successfully rebutted Tuttle's presumption of medical use for counts IV-VII by evidence of the conduct relating to marijuana in counts I-III and, if so, whether Tuttle has otherwise shown that the charged conduct for which he claims immunity was consistent with the medical use of marijuana. The flexibility allowing the trial court to make this decision in § 4(d) permits the trial court to hear evidence to determine if Tuttle truly was a primary caregiver simply trying to assist patients, or if Tuttle acted outside the protection of the MMMA.[91]

---

[91] Under § 4, losing the § 4(d) presumption is not fatal. Even if the prosecution successfully rebuts the § 4(d) presumption in counts IV-VII related to Tuttle's manufacturing of marijuana for himself and any patients, Tuttle may still prove by a preponderance of the evidence that he satisfied the last element of § 4(a) and § (4)(b), which requires that he was engaged in the medical use of marijuana during the conduct resulting in the specific charged offense(s).

To that end, factual findings are needed to determine Tuttle's entitlement to immunity under § 4 for counts IV-VII. As a result, a new § 4 evidentiary hearing conforming to the holdings expressed in this opinion is necessary to determine Tuttle's entitlement to § 4 immunity.

## 2. SECTION 8 DEFENSE

The lower courts properly concluded that Tuttle was not entitled to the § 8 affirmative defense. During an evidentiary hearing, Tuttle presented his registry identification card and the registry identification cards belonging to Michael Batke and Frank Colon. Lalonde, Batke, and Colon also testified at the hearing.

Lalonde testified that he first came into contact with Tuttle through an unofficial internet site intended to match medical marijuana patients and caregivers. He also testified that he was a registered qualifying patient and that he told Tuttle he was using marijuana to alleviate pain. Lalonde's testimony, however, did not meet the first and third element of § 8(a), requiring his condition to be diagnosed in the course of a bona fide physician-patient relationship through which the physician found the condition suitable for the medical use of marijuana. Lalonde did not testify about how much marijuana he needed to treat his debilitating condition under § 8(a)(2) or if he engaged in the use of marijuana under § 8(a)(3) to treat his debilitating condition.

Batke testified that he was a registered qualifying patient and that Tuttle was connected to him as a registered caregiver. Batke also testified that he would call Tuttle every time he needed marijuana. As a result, Tuttle provided Batke with approximately two ounces of marijuana a month. This does not speak to the amount of marijuana Batke

47

reasonably needed in order to treat his debilitating condition, only to the amount of marijuana actually provided. Nor did Batke establish that he had a bona fide relationship with a physician. Lastly, Colon testified that he was a registered qualifying patient, that he had a medical condition, and that he utilized Tuttle as a caregiver. Colon stated he would request between one and two ounces of marijuana each week from Tuttle. Colon did not testify that he received a full medical assessment in the course of a bona fide physician-patient relationship.

Lalonde's, Batke's, and Colon's testimony was deficient in establishing at least one element of § 8(a). Additionally, the patients' testimony combined with their registry identification cards did not establish prima facie evidence under § 8(a). Therefore, Tuttle failed to present prima facie evidence of each element of § 8(a). The Court of Appeals correctly affirmed the trial court's denial of Tuttle's motion to dismiss under § 8 and correctly denied his request to present a § 8 defense at trial.

## IV. CONCLUSION

In *People v Hartwick*, Docket No. 148444, we conclude that (1) the trial court must hold a new evidentiary hearing to determine Hartwick's entitlement to immunity under § 4, and (2) Hartwick is not entitled to an affirmative defense under § 8. Accordingly, we affirm the judgment of the Court of Appeals in part, reverse in part, and remand to the trial court for proceedings not inconsistent with this opinion.

In *People v Tuttle*, Docket No. 148971, we conclude that (1) the trial court must hold a new evidentiary hearing to determine Tuttle's entitlement to immunity under § 4,

48

and (2) Tuttle is not entitled to an affirmative defense under § 8. Accordingly, we affirm the judgment of the Court of Appeals in part, reverse in part, and remand to the trial court for proceedings not inconsistent with this opinion.

Brian K. Zahra
Robert P. Young, Jr.
Stephen J. Markman
Mary Beth Kelly
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein