# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellant,

v

ISKANDAR MANUEL,

Defendant-Appellee.

FOR PUBLICATION
April 18, 2017
9:05 a.m.

No. 331408
Ingham Circuit Court
LC No. 15-000166-FH

Before: RONAYNE KRAUSE, P.J., and K. F. KELLY and GADOLA, JJ.

GADOLA, J.

In this case involving the Michigan Medical Marihuana[1] Act (MMMA), MCL 333.26421 *et seq.*, defendant was charged with delivering or manufacturing 20 or more, but less than 200 marijuana plants, MCL 333.7401(2)(d)(*ii*); possessing marijuana with intent to deliver, MCL 333.7401(2)(d)(*iii*); maintaining a drug house, MCL 333.7405(1)(d) and MCL 333.7406; and possessing a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court dismissed the charges after ruling that defendant was entitled to immunity under MCL 333.26424 (§ 4)[2] of the MMMA. The prosecution appeals that ruling as of right. We affirm.

## I. BACKGROUND FACTS

On May 14, 2014, Michigan State Police Detective Sergeant Charles Rozum executed a search warrant at defendant's home. Defendant was registered as a primary caregiver under the MMMA and had five associated qualifying patients. On the day of the search, Rozum arrived at defendant's home at 7:15 p.m. and encountered defendant and another man, Michael Lauria, in

---

[1] We use the more common spelling "marijuana" unless directly quoting the MMMA.

[2] Discussed in more detail in this opinion, § 4 allows a defendant to "claim entitlement to immunity for any or all charged offenses" if the defendant sufficiently proves that he or she "(1) was issued and possessed a valid registry identification card, (2) complied with the requisite volume limitations of § 4(a) and § 4(b), (3) stored any marijuana plants in an enclosed, locked facility, and (4) was engaged in the medical use of marijuana." *People v Hartwick*, 498 Mich 192, 217-218; 870 NW2d 37 (2015), citing MCL 333.26424(a) and (b).

the driveway close to the garage, which was attached to defendant's home. Rozum testified that he recovered 12 marijuana plants sitting on a freezer in the open garage. Defendant explained that Lauria had just delivered "12 clones" for which defendant paid $120. According to defendant, at the precise moment he "want[ed] to go to the basement, the police raid[ed] [the] house." Rozum testified that "[t]here wasn't a grow operation in the garage," but there was a grow operation in defendant's basement.

Rozum explained that the grow operation in defendant's basement was located behind a locked door, but there was a key on a keyring with several other keys already inserted into the locking mechanism, which allowed him to access the room. Defendant testified that the keyring held his house and car keys. Rozum testified that he found two unlocked padlocks, and defendant explained that he secured the door with the two padlocks "[j]ust to make sure nobody can go inside[.]" Rozum said that inside the grow room he encountered another locked door that also had a key in its lock. Defendant testified that the padlocks were not in place and the keys were in the door locks because he was planning to put the plants he purchased from Lauria into the grow room. Defendant testified that prior to Lauria's arrival he was "in the basement preparing 12 pot[s]" so he could transfer the plants. Rozum stated that he found 59 marijuana plants inside the grow room and also found "tins containing suspected marijuana buds."

Defendant moved to dismiss the charges under § 4. At an evidentiary hearing on the motion, Rozum testified that he weighed the suspected marijuana using a digital scale at his office after the search. Rozum noted that he did not include the packaging when he weighed the suspected marijuana, but did use something to contain the material on the scale. He agreed that he zeroed off the scale before weighing the suspected marijuana. Rozum testified that the tins held 1,195 grams of what was later determined to be marijuana. The marijuana was then delivered to the Michigan State Police Crime Laboratory in Lansing, Michigan.

Sandra Jean Schafer, a forensic scientist with the Michigan State Police Crime Laboratory, weighed the marijuana without any packaging on July 2, 2014. She reported that it weighed 1,068 grams, a difference of 127 grams. She testified that the crime laboratory scales were "calibrated on a monthly basis" and she specifically checked the calibration before using the scale in this instance. Schafer said the marijuana she weighed "was not compressed. It was not moldy. It was not wet, and it was not charred." She described it as being "consistently dry."

Michigan State Police Detective Sergeant Charles Barker testified that he did not know whether the scales at the office were calibrated on a routine basis. "In general," he asserted, "most of the weights that are taken at the office are greater than that that is found by the lab." Barker attributed most of these differences to weighing an item in its packaging at the office, but without packaging at the crime laboratory. However, Barker characterized a 127-gram difference as "way excessive."

Frank Telewski, a professor of plant biology at Michigan State University, testified that the difference of 127 grams was a "rather large discrepancy." Telewski opined that the discrepancy was not likely the result of inaccuracies in the scales, but rather could be easily explained by a loss of moisture. Telewski explained, "[T]he material on the earlier date weighed more because it had a higher moisture content than the material that was subsequently weighed

several weeks later." Telewski admitted that he did not examine the scales that were used, but noted that he had no reason to question the accuracy of the scales.

Rozum described the marijuana he encountered in the tins on the day of the search as "[d]ried marijuana." Explaining how he knew it was not moist, he stated, "When you touch the marijuana your hands didn't get wet, there was no moisture content. When you felt it[,] it felt stiff, rough, dry." He explained that the marijuana was "crunchy" and testified that, based on his training and 10 years of experience as a narcotics officer, he believed the marijuana was ready to be used. Rozum said that if wet marijuana is stored in a container, "it will mold. If it's dry, it won't mold." Rozum testified that he was unable to say "if [the marijuana] was [dried] a hundred percent or anything less than that, but . . . none of the buds molded in our property room . . . which led me to believe it was dry." Rozum agreed that the marijuana was stored in a paper bag in the property room.

Telewski testified that plant material can "take anywhere from a few days to 14 days" to dry. He explained that one could "look at the outside of a marijuana bud, it could look like it's dry, but . . . you may not have removed the moisture from inside of it and . . . it may not be dry." Telewski opined that "[w]eighing the plant material is the best way to determine how well it's dried." Telewski said that when he viewed the marijuana on December 22, 2015, it "appeared to be in a dried state[.]" He agreed, however, that he did not perform any scientific tests to determine the moisture content of the marijuana. Telewski weighed the marijuana on December 22, 2015, and it weighed 2 pounds 9.25 ounces,[3] but he explained that he did not remove the marijuana from the plastic bag it was stored in and did not calibrate the scale immediately before taking the weight.

Defendant testified that he began drying the marijuana "two or three days" before the police executed the search warrant, and planned to keep the marijuana drying in the tins "[a]bout six, seven days more." Defendant further explained that he did not put all of the marijuana in the tins on the same day or at the same time.

The prosecution conceded at the hearing that defendant possessed a valid registry identification card at all times relevant to the charged offenses. After taking testimony, the court concluded that defendant complied with the volume limitations of § 4. It found that defendant possessed only 71 marijuana plants and that the marijuana he had in the tins was unusable because it was in "various stages of drying." The court found that defendant stored the marijuana in an enclosed, locked facility because "he simply had [his] keys in the room for a very short time anticipating the delivery . . . ." Finally, the trial court found that defendant was engaged in the medical use of marijuana, despite the prosecution's contention that he illegally purchased marijuana from Lauria. Accordingly, the trial court ruled that defendant was entitled to § 4 immunity and dismissed the charges against him.

## II. STANDARDS OF REVIEW

---

[3] Approximately 1,169 grams.

Whether a defendant is entitled to immunity under § 4 is a question of law that a trial court must determine before trial. *People v Hartwick*, 498 Mich 192, 212-213; 870 NW2d 37 (2015). To determine whether a defendant is entitled to § 4 immunity, a trial court "must make factual determinations, including whether the defendant has a valid registry identification card and whether he or she complied with the volume, storage, and medical use limitations." *Id.* at 213-214. We review a trial court's factual findings for clear error. *Id.* "Questions of law are reviewed de novo by appellate courts." *Id.* A trial court's decision to dismiss criminal charges is reviewed for an abuse of discretion. *People v Bylsma*, 493 Mich 17, 26; 825 NW2d 543 (2012). "A trial court necessarily abuses its discretion when it makes an error of law." *People v Waterstone*, 296 Mich App 121, 132; 818 NW2d 432 (2012).

This appeal also raises issues of statutory interpretation, which we review de novo. *People v Kolanek*, 491 Mich 382, 393; 817 NW2d 528 (2012). "[B]ecause the MMMA was the result of a voter initiative, our goal is to ascertain and give effect to the intent of the electorate, rather than the Legislature, as reflected in the language of the law itself." *Id.* at 397. When construing the MMMA, we must assign the words of the statute their plain and ordinary meaning, as the electorate would have understood them. *Id.*

## III. SECTION 4 IMMUNITY

A defendant may claim immunity under § 4 of the MMMA if the defendant proves by a preponderance of the evidence that, at the time of the charged offense, the defendant

(1) was issued and possessed a valid registry identification card,

(2) complied with the requisite volume limitations of § 4(a) and § 4(b),

(3) stored any marijuana plants in an enclosed, locked facility, and

(4) was engaged in the medical use of marijuana. [*Hartwick*, 498 Mich at 217-218, citing MCL 333.26424(a) and (b).]

The prosecution concedes that defendant was issued and possessed a valid registry identification card at all times relevant to the charged offenses.

The volume limitations of § 4(a) and § 4(b) require a primary caregiver or qualifying patient to possess no more than a specified number of marijuana plants and a specified amount of usable marijuana. "When a primary caregiver is connected with one or more qualifying patients, the amount of usable marijuana and the number of plants is calculated in the aggregate—2.5 ounces of usable marijuana and 12 marijuana plants for each qualifying patient, including the caregiver if he or she is also a registered qualifying patient acting as his or her own caregiver." *Hartwick*, 498 Mich at 218-219. A qualifying patient or primary caregiver who possesses more marijuana than allowed under § 4(a) and § 4(b) cannot establish the second element of immunity.

In this case, defendant is both a qualifying patient and a primary caregiver for five patients, so he was allowed to cultivate up to 72 marijuana plants and to possess up to 15 ounces, or approximately 425.24 grams, of usable marijuana under the MMMA. It is clear that defendant stayed within the cultivation limitation because he only possessed 71 marijuana plants.

However, he also possessed marijuana in tins that weighed in at 1,195 grams, 1,068 grams, and 1,169 grams, or nearly two-and-a-half-times the legally permitted amount of "usable" marijuana. The question, however, is whether this marijuana was "usable" for purposes of the MMMA.

The MMMA defines "usable marihuana" as "the *dried* leaves, flowers, plant resin, or extract of the marihuana plant, but does not include the seeds, stalks, and roots of the plant." MCL 333.26423(n) (emphasis added). In *People v Randall*, unpublished opinion per curiam of the Court of Appeals, issued January 13, 2015 (Docket No. 318740), a panel of this Court examined the meaning of the word "dried" as used in the former definition of "usable marihuana" under the MMMA. See MCL 333.26423(k), as amended by 2012 PA 512 (defining "usable marihuana" as "the dried leaves and flowers of the marihuana plant, and any mixture or preparation thereof, but does not include the seeds, stalks, and roots of the plant").[4] We find instructive and persuasive the following definition provided in *Randall*, and therefore adopt it as our own:

> "Dried" is the past participle or past tense of the verb "dry." *Random House Webster's College Dictionary* (1997). A past participle is a "nonfinite verb form ending usu. in *–ed*" which "may also function adjectivally." Garner, *Garner's Modern American Usage* (3rd ed) (New York: Oxford University Press, 2009), p 909. As a past participle, it has a perfective aspect, which is a "verb aspect that expresses action as complete." *Id.* at 883, 909. Likewise, the past tense signals "an action or even a state that occurred at some previous time." *Id*. at 920. Additionally, the past-perfect tense denotes "an act, state, or condition [that] was completed before another specified past time or past action." *Id.* Therefore, the term "dried" clearly indicates a *completed* condition.
>
> This is in contrast to present participles, which are verb forms "ending in *—ing* and used in verb phrases to signal the progressive aspect." *Id.* at 909. Present participles may also be adjectival. *Id.* The progressive aspect shows "that an action or state—past, present, or future—was, is, or will be unfinished at the time referred to." *Id.* at 883. [*Randall*, unpub op at 3-4.]

At the evidentiary hearing, Telewski testified the weight difference in the marijuana from the time Rozum weighed it immediately after the search (1,195 grams) to the time Schafer weighed it in the laboratory on July 2, 2014 (1,068 grams) was best explained by a "loss of moisture, so the material on the earlier date weighed more because it had a higher moisture content than the material that was subsequently weighed several weeks later." Although Telewski recorded the weight of the marijuana as 1,169 grams on December 22, 2015, unlike Rozum and Schafer, he weighed the marijuana in its packaging and acknowledged that he did not calibrate the scale before taking the weight. Telewski opined that marijuana could take anywhere "from a few days to 14 days" to dry. Defendant testified that he had started drying the

---

[4]Although this Court's unpublished opinions are not binding, they may be instructive or persuasive. *Adam v Bell*, 311 Mich App 528, 533 n 1; 879 NW2d 879 (2015); MCR 7.215(C)(1).

marijuana "two or three days" before Rozum executed the search warrant, and he planned to keep the material drying "about six, seven days more." This evidence suggests that the marijuana defendant possessed was "drying" rather than "dried."

We note that Rozum provided some testimony to the contrary. Specifically, Rozum described the marijuana he found in the tins on the day of the search as "dried marijuana," explaining that it "felt stiff, rough, dry," and that it was "crunchy." Rozum also testified that the marijuana did not mold after it was placed in a paper bag in the property room, which he said led him "to believe it was dry."

The trial court was charged with resolving all factual disputes, which we review for clear error. *Hartwick*, 498 Mich at 201. "The clear error standard asks whether the appellate court is left with a definite and firm conviction that a mistake has been made." *People v Rhodes*, 495 Mich 938, 938; 843 NW2d 214 (2014). Given Telewski's expert testimony that the weight differential of 127 grams was most likely due to a loss of moisture, and defendant's testimony that the harvested marijuana was in various stages of drying because not all of it had been placed in the tins at the same time, and had only been in the tins two to three days, we are not definitely and firmly convinced that the trial court made a mistake when it found that the marijuana was in "various stages of drying" and therefore was not usable under the MMMA. Put simply, the marijuana was "drying" not "dried," and therefore was not usable under the statutory definition.

Regarding the third element of immunity, § 4 provides that marijuana plants must be "kept in an enclosed, locked facility." The MMMA defines an "enclosed, locked facility" to mean "a closet, room, or other comparable, stationary, and fully enclosed area equipped with secured locks or other functioning security devices that permit access only by a registered primary caregiver or registered qualifying patient." MCL 333.26423(d). The definition of "enclosed, locked facility" also includes a motor vehicle if certain additional conditions are met. See MCL 333.26423(d)(1) and (2).

Rozum found 59 marijuana plants in defendant's grow room in his basement. Testimony at the hearing revealed that defendant's grow room was protected by two different doors with locks, the first of which also had two padlocks. Although the padlocks were not locked and there were keys in the door locks at the time of the search, the statute only requires that marijuana be kept in an "enclosed area *equipped with secured locks* . . . ." MCL 333.26423(d) (emphasis added). Further, although Rozum found 12 marijuana plants sitting on a freezer in defendant's garage, testimony showed that defendant received the plants just minutes before the search and that he was in the active process of relocating the plants to his grow room. Specifically, defendant testified that Lauria arrived at his home "like two minutes, three minutes" before the police arrived, and Lauria testified that the police showed up less than five minutes after he arrived. Defendant also testified that he had prepared pots in his basement for the 12 marijuana plants, and he said that the doors to his grow room were unlocked for the sole purpose of moving the plants into the room. Defendant's explanation was supported by testimony that his house and car keys were also on the keyring along with the key that was in the first door lock.

The MMMA defines the medical use of marijuana to include the "acquisition, possession, . . . use, . . . delivery, *transfer, or transportation* of marihuana . . . ." MCL 333.26423(h) (emphasis added). As evidenced by the definition of the medical use of marijuana and by the

fact that the MMMA includes criteria to allow a motor vehicle to fall within the definition of an "enclosed, locked facility," the electorate clearly intended the MMMA to allow the movement of marijuana from one place to another. Necessarily, then, a window of time must exist in which a primary caregiver or qualifying patient could legally unlock an enclosed area in which marijuana is being stored and move it to another enclosed, locked facility. The law only requires that an enclosed room be secured by one locked door to constitute an "enclosed, locked facility" for purposes of the MMMA. See MCL 333.26423(d). Yet defendant's grow room was secured by not one, but two locked doors, the first of which was also secured by two padlocks. Defendant explained that he installed the extra padlocks "[j]ust to make sure nobody can go inside, make it hard." Far from flouting the law, these facts demonstrate that defendant went to excessive measures to comply with the statutory requirements of § 4. Under the circumstances, we are not definitely and firmly convinced that the trial court made a mistake by finding that defendant kept his 71 marijuana plants in an enclosed, locked facility.

Finally, to establish the fourth element of § 4 immunity, a defendant must prove that he or she was engaged in the medical use of marijuana. *Hartwick*, 498 Mich at 219. We presume that a defendant was engaged in the medical use of marijuana under § 4(d) if the defendant shows by a preponderance of the evidence that, at the time of the charged offense, he or she (1) possessed a valid registry identification card and (2) complied with the volume limitations of § 4(a) and § 4(b). *Hartwick*, 498 Mich at 220. "[T]he prosecution may rebut the § 4(d) presumption . . . by presenting evidence that the defendant's conduct was not for the purpose of alleviating the registered qualifying patient's debilitating medical condition[.]" *Id.* at 202.

> [Additionally,] non-MMMA-compliant conduct may rebut the § 4(d) presumption of medical use for otherwise MMMA-compliant conduct if a nexus exists between the non-MMMA-compliant conduct and otherwise MMMA-compliant conduct;
>
> [I]f the prosecution rebuts the § 4(d) presumption of the medical use of marijuana, the defendant may still establish, on a charge-by-charge basis, that the conduct underlying a particular charge was for the medical use of marijuana. [*Id.* at 202-203.]
>
> Because the trial court properly found that defendant possessed a valid registry identification card and stayed within the volume limitations of § 4(a) and § 4(b), he was entitled to a presumption that he was engaged in the medical use of marijuana. *Id.* at 202. To rebut that presumption, the prosecution needed to present evidence that defendant's conduct "was not for the purpose of alleviating the registered qualifying patient's debilitating medical condition[.]" *Id.* The prosecution argues that defendant purchased 12 marijuana plants from Lauria, with whom he was not connected under the MMMA, which was enough to show that he was not engaged in the medical use of marijuana. We disagree.

The MMMA is silent as to how a qualifying patient or primary caregiver is to obtain marijuana plants for cultivation. The MMMA does, however, define the medical use of marijuana to include "the *acquisition* . . . of marihuana . . . ." MCL 333.26423(h) (emphasis added). Therefore, acquiring marijuana plants that do not exceed the statutory limits cannot

rebut the presumption that defendant was engaged in the medical use of marijuana. Section 4(b) does not require a primary caregiver to obtain the marijuana to be used "for assisting a qualifying patient" from the qualifying patient or another caregiver. It does, however, provide that "[a] primary caregiver shall not *transfer a marihuana-infused product to* any individual who is not a qualifying patient to whom he or she is connected through the department's registration process," § 4(o) (emphasis added). Defendant was neither *transferring to* Lauria, from whom he was purchasing the marijuana, nor was the item involved a *marihuana-infused product*.

Evidence at the hearing showed that defendant acquired 12 marijuana plants from Lauria, which kept defendant within the legal limit. Defendant testified that he was readying the grow room so that he could transfer the plants into pots in the room. Thus, the record shows he was in the process of cultivating marijuana. There is no evidence that defendant did not intend to use the marijuana he acquired from Lauria "to treat or alleviate a registered qualifying patient's debilitating medical condition or symptoms associated with the debilitating medical condition." MCL 333.26423(h). Therefore, the trial court properly found that defendant was engaged in the medical use of marijuana.

In sum, the trial court properly concluded that defendant was entitled to § 4 immunity, and therefore did not abuse its discretion by dismissing the charges against him.

Affirmed.

/s/ Michael F. Gadola
/s/ Amy Ronayne Krause
/s/ Kirsten Frank Kelly