# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JOSEPH THOMAS HENSLEY,

        Defendant-Appellant.

UNPUBLISHED
July 17, 2018

No. 341779
Oakland Circuit Court
LC No. 2014-249250-FH

Before: BORRELLO, P.J., and M. J. KELLY and BOONSTRA, JJ.

PER CURIAM.

Defendant was charged with one count of manufacturing 20 or more, but less than 200, marijuana plants, MCL 333.7401(2)(d)(*ii*), and one count of possession with intent to deliver marijuana, MCL 333.7401(2)(d)(*iii*). He appeals by leave granted[1] the trial court's opinion and order denying his motion to dismiss the charges against him under § 8 of the Michigan Medical Marihuana[2] Act ("MMMA"), MCL 333.26421 *et seq*, and prohibiting him from offering a § 8 affirmative defense at trial. We hold that, while defendant is not entitled to the dismissal of the charges against him as a matter of law, he may present a § 8 affirmative defense to the jury at trial. We therefore affirm in part, reverse in part, and remand for further proceedings.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Defendant, his brother Jacob Hensley (Jacob), and defendant's friend Melissa Winstead (Winstead), went to the office of Dr. Zeia Casab, M.D. in April 2013. Defendant was registered as a medical marijuana user under the MMMA and sought to have Dr. Casab recertify his registry identification card because he had been unable to locate the physician who had initially

---

[1] *People v Hensley*, unpublished order of the Court of Appeals, entered March 1, 2018 (Docket No. 341779).

[2] "[B]y convention this Court uses the more common spelling 'marijuana' in its opinions." *People v Carruthers*, 301 Mich App 590, 593, n 1; 837 NW2d 16 (2013), citing *People v Jones*, 301 Mich App 566, 569 n 1; 837 NW2d 7 (2013). Therefore, we will refer to "marijuana" by that spelling except when quoting from the MMMA.

certified him under the MMMA. He also referred Dr. Casab to Jacob and Winstead, who both believed that they could potentially benefit from using marijuana medicinally. Dr. Casab provided "written certifications" to defendant, Jacob, and Winstead after in-person sessions with each of them.

Defendant, Jacob, and Winstead then submitted their applications for registry identification cards, which were approved. Defendant agreed to serve as Jacob's and Winstead's "caregiver," and was permitted to provide them with marijuana for medical use. In August 2013, defendant's home was raided by the Oakland County Sheriff's Department. Police seized approximately 36.07 ounces of marijuana from defendant's home as well as 31 "plants with roots." Defendant was subsequently charged as stated. Defendant's wife, Crystal Fayla Hensley (Crystal), also incurred charges arising from the 2013 raid. Her case was consolidated with defendant's before the trial court. Crystal is not a party to this appeal.

Defendant moved to dismiss the charges against him under § 8 of the MMMA[3], arguing that there was no genuine issue of material fact regarding the medical purpose for the marijuana he possessed for himself and on behalf of Jacob and Winstead, and that therefore he was entitled to dismissal of the charges as a matter of law. The trial court stayed the proceedings pending the Michigan Supreme Court's decision in *People v Hartwick*, 498 Mich 192; 870 NW2d 37 (2015). An evidentiary hearing on defendant's motion was held in December 2016. Proceedings were again stayed by the trial court after this Court granted Crystal's motion to appeal the court's denial of her motion to suppress.[4] This Court ultimately affirmed the trial court's denial.[5]

The evidentiary hearing on defendant's motion continued on June 28, 2017. Defendant argued that he had met his burden of proving that he was entitled to dismissal of the charges against him because he, Jacob and Winstead all possessed valid registry cards, had a bona fide physician-patient relationship with Dr. Casab, and only used marijuana for medical purposes; further, defendant argued that there was no genuine issue of material fact that he did not possess more marijuana than was reasonably necessary to ensure uninterrupted availability to defendant and his patients. The trial court disagreed, holding that the physician certifications provided to the court failed to designate any debilitating medical condition for the cardholder, and that defendant and his patients lacked a bona fide physician-patient relationship with Dr. Casab. The court also held that a genuine issue of material fact existed regarding whether defendant had only possessed enough marijuana as was reasonably necessary to ensure uninterrupted availability to himself and his patients. Specifically, the trial court noted that defendant and the prosecution differed on whether the entire amount of marijuana seized was "usable" marijuana and that

---

[3] Defendant admitted that at the time of the raid he possessed too large of a quantity of marijuana to qualify for § 4 immunity under the MMMA. See MCL 333.264524.

[4] *People v Hensley*, unpublished order of the Court of Appeals, entered February 26, 2016 (Docket No. 331089).

[5] *People v Hensley*, unpublished per curiam opinion of the Court of Appeals, issued March 16, 2017 (Docket No. 331089).

defendant claimed that even if the total amount seized was usable marijuana, that amount was in fact not enough to supply his patients. The trial court did not determine whether defendant, Jacob, or Winstead only used marijuana for medical purposes.

The trial court therefore denied defendant's motion to dismiss and ordered that defendant was prohibited from asserting a § 8 affirmative defense at trial. This appeal followed.

## II. STANDARD OF REVIEW

"We review for an abuse of discretion a circuit court's ruling on a motion to dismiss but review de novo the circuit court's rulings on underlying questions regarding the interpretation of the MMMA, which the people enacted by initiative in November 2008." *People v Bylsma*, 493 Mich 17, 26; 825 NW2d 543 (2012) (citations omitted). "An abuse of discretion occurs when the trial court's decision is outside the range of principled outcomes." *People v Daniels*, 311 Mich App 257, 265; 874 NW2d 732 (2015), citing *People v Duenaz*, 306 Mich App 85, 90; 854 NW2d 531 (2014). This Court reviews "the evidence de novo to determine whether the trial court properly granted or denied the defendant's motion to dismiss under § 8." *People v Anderson*, 298 Mich App 10, 16; 825 NW2d 641 (2012).

## III. ANALYSIS

Defendant contends that the trial court erred by ruling that he had failed to present prima facie evidence supporting a § 8 affirmative defense under the MMMA, and that it erred when it failed to dismiss the charges against him because there were no material questions of fact relating to his § 8 affirmative defense. We disagree that defendant is entitled to the dismissal of the charges, but agree that he may present a § 8 affirmative defense at trial.

In *People v Kolanek*, 491 Mich 382, 394; 817 NW2d 528 (2012), our Supreme Court stated:

> The MMMA does *not* create a general right for individuals to use and possess marijuana in Michigan. Possession, manufacture, and delivery of marijuana remain punishable offenses under Michigan law. Rather, the MMMA's protections are limited to individuals suffering from serious or debilitating medical conditions or symptoms, to the extent that the individuals' marijuana use is carried out in accordance with the provisions of [the MMMA]. [Alteration in original.]

"A defendant seeking to assert the MMMA's statutory affirmative defense must present prima facie evidence for each element of § 8(a)." *People v Hartwick*, 498 Mich 192; 870 NW2d 37 (2015). "[W]hen the § 8 affirmative defense is submitted to a fact-finder, the defendant's burden of proof is to establish the elements of § 8(a) by a preponderance of the evidence." *Id*. at 228 n 69. Additionally:

> A primary caregiver has the burden of establishing the elements of § 8(a)(1) for each patient to whom the primary caregiver is alleged to have unlawfully provided marijuana. In this context, a primary caregiver who provides marijuana

-3-

to a putative patient plainly assumes the risk that the patient does not actually meet the elements of § 8(a)(1) or that the patient may not cooperate in a subsequent prosecution of the primary caregiver, regardless what that person may have otherwise told the primary caregiver. [*Id*. at 232.]

When ruling on a motion to dismiss under § 8(a) of the MMMA, a "trial court may not weigh the evidence, assess credibility, or resolve factual disputes at the hearing." *Anderson*, 298 Mich App at 16 (citation omitted). "Rather, the trial court must determine—as a matter of law—if the defendant established his or her right to have the charges dismissed under § 8, or if there are material factual disputes that must be resolved by a jury." *Id*. (citation omitted).

Section 8 of the MMMA, MCL 333.26428, provides, in relevant part:

(a) Except as provided in section 7(b), a patient and a patient's primary caregiver, if any, may assert the medical purpose for using marihuana as a defense to any prosecution involving marihuana, and this defense shall be presumed valid where the evidence shows that:

(1) A physician has stated that, in the physician's professional opinion, after having completed a full assessment of the patient's medical history and current medical condition made in the course of a bona fide physician-patient relationship, the patient is likely to receive therapeutic or palliative benefit from the medical use of marihuana to treat or alleviate the patient's serious or debilitating medical condition or symptoms of the patient's serious or debilitating medical condition;

(2) The patient and the patient's primary caregiver, if any, were collectively in possession of a quantity of marihuana that was not more than was reasonably necessary to ensure the uninterrupted availability of marihuana for the purpose of treating or alleviating the patient's serious or debilitating medical condition or symptoms of the patient's serious or debilitating medical condition; and

(3) The patient and the patient's primary caregiver, if any, were engaged in the acquisition, possession, cultivation, manufacture, use, delivery, transfer, or transportation of marihuana or paraphernalia relating to the use of marihuana to treat or alleviate the patient's serious or debilitating medical condition or symptoms of the patient's serious or debilitating medical condition.

However,

if there are no material questions of fact and the defendant has not shown the elements listed in subsection (a), the defendant is not entitled to dismissal of the charges and the defendant cannot assert § 8(a) as a defense at trial. A trial judge must preclude from the jury's consideration evidence that is legally insufficient to support the § 8 defense because, in this instance, no reasonable juror could conclude that the defendant satisfied the elements of the defense. [*Kolanek*, 491 Mich at 412-413.]

-4-

A defendant may not present a § 8 affirmative defense to the jury when that defense fails as a matter of law, because such a presentation "would unnecessarily burden the jury and the circuit court with irrelevant testimony." *Kolanek*, 491 Mich at 413. See also *Bylsma*, 315 Mich App at 387 (holding that the trial court properly denied the motions to dismiss under § 8 and that the trial court correctly concluded that the defendants were precluded from presenting evidence of a § 8 affirmative defense during trial because neither defendant was a "patient" or a "caregiver" under the MMMA).

### A. BONA FIDE PHYSICIAN-PATIENT RELATIONSHIP

Defendant contends that the trial court erred by holding that his § 8 affirmative defense failed as a matter of law because he, Jacob, and Winstead lacked a bona fide physician-patient relationship with Dr. Casab. We conclude that material questions of fact exist regarding this issue.

As explained by our Supreme Court, § 8(a)(1) of the MMMA can "be reduced to three elements":

> (1) The existence of a bona fide physician-patient relationship,
>
> (2) in which the physician completes a full assessment of the patient's medical history and current medical condition, and
>
> (3) from which results the physician's professional opinion that the patient has a debilitating medical condition and will likely benefit from the medical use of marijuana to treat the debilitating medical condition. [*Hartwick*, 498 Mich at 229.]

As provided by MCL 333.26423(a), in relevant part:

> (a) "Bona fide physician-patient relationship" means a treatment or counseling relationship between a physician and patient in which all of the following are present:
>
> (1) The physician has reviewed the patient's relevant medical records and completed a full assessment of the patient's medical history and current medical condition, including a relevant, in-person, medical evaluation of the patient.
>
> (2) The physician has created and maintained records of the patient's condition in accord with medically accepted standards.
>
> (3) The physician has a reasonable expectation that he or she will provide follow-up care to the patient to monitor the efficacy of the use of medical marihuana as a treatment of the patient's debilitating medical condition.
>
> (4) If the patient has given permission, the physician has notified the patient's primary care physician of the patient's debilitating medical condition and certification for the use of medical marihuana to treat that condition.

"As part of the process for obtaining a registry identification card, an applicant must submit, among other materials, a 'written certification.' " *Hartwick*, 498 Mich at 229, quoting MCL 333.26426(a)(1). "[T]he actual text of the physician's statement submitted as part of the registration process might suffice" to establish that there was a bona fide physician-patient relationship, or satisfy each element of the physician-patient relationship. *Id*. at 231 n 77.

Under MCL 333.26423(q):

(q) "Written certification" means a document signed by a physician, stating all of the following:

(1) The patient's debilitating medical condition.

(2) The physician has completed a full assessment of the patient's medical history and current medical condition, including a relevant, in-person, medical evaluation.

(3) In the physician's professional opinion, the patient is likely to receive therapeutic or palliative benefit from the medical use of marihuana to treat or alleviate the patient's debilitating medical condition or symptoms associated with the debilitating medical condition.

During the evidentiary hearing, defendant provided the trial court with copies of Dr. Casab's written certifications for himself, Jacob, and Winstead. The written certifications stated that Dr. Casab had complied with all four requirements of MCL 333.26423(a) in order to establish bona fide physician-patient relationships with defendant, Jacob, and Winstead. Nonetheless, the trial court ruled that defendant, Jacob, and Winstead "had no intention of establishing a physician-patient relationship with [Dr. Casab]," because defendant already had a primary care physician, and that he, Jacob, and Winstead went to Dr. Casab "for the sole purpose of obtaining a medical marihuana card." The trial court also noted that neither defendant, Jacob nor Winstead had received any follow-up care from Dr. Casab.

The trial court erred by imposing requirements beyond what was required by MCL 333.26423(a). Whether defendant already had a primary care physician is irrelevant under MCL 333.26423(a), and in fact, MCL 333.26423(a)(4) explicitly contemplates the possibility that a physician other than a patient's primary care physician may complete a written certification under the MMMA. Moreover, MCL 333.26423(a) has no requirement barring a patient from seeking out a physician for the sole purpose of obtaining a written certification as provided by the MMMA. Additionally, MCL 333.26423(a)(3) does not require that follow-up care *has been provided*; rather, it only requires that a physician have a "reasonable expectation" of providing follow-up care to a patient. Here, defendant and his patients obtained their certifications from Dr. Casab in April 2013. The certifications stated that Dr. Casab had a reasonable expectation that he would provide follow-up care to defendant, Jacob, and Winstead. Defendant's home was raided by police a mere four months later in August 2013. On this record, we conclude that genuine issues of material fact exist regarding whether Dr. Casab had a reasonable expectation that he would provide follow-up care to defendant, Jacob, and Winstead.

The trial court also found that defendant had failed to provide a written certification or other evidence stating that Dr. Casab had diagnosed defendant, Jacob, and Winstead with "debilitating medical conditions," and that the certifications therefore did not support defendant's claim that a bona fide physician-patient relationship existed. We disagree with the trial court's assessment.

As explained by our Supreme Court:

A valid registry identification card is prima facie evidence that a physician has determined the registered qualifying patient has a debilitating medical condition and will likely benefit from the medical use of marijuana to treat the debilitating medical condition. In addition, a valid registry identification card issued after April 1, 2013, the effective date of 2012 PA 512, is also prima facie evidence that a physician has conducted a full, in-person assessment of the registered qualifying patient. We reach this conclusion because § 6(c) requires the state to verify all the information contained in an application for a registry identification card; therefore, a valid registry identification card is prima facie evidence of anything contained in the application. This prima facie evidence satisfies two elements of § 8(a)(1), but does not satisfy the last element requiring prima facie evidence of a bona fide physician-patient relationship. [*Hartwick*, 498 Mich at 203 n 10.]

MCL 333.26423(b) provides, in relevant part:

(b) "Debilitating medical condition" means 1 or more of the following:

(1) Cancer, glaucoma, positive status for human immunodeficiency virus, acquired immune deficiency syndrome, hepatitis C, amyotrophic lateral sclerosis, Crohn's disease, agitation of Alzheimer's disease, nail patella, or the treatment of these conditions.

(2) A chronic or debilitating disease or medical condition or its treatment that produces 1 or more of the following: cachexia or wasting syndrome; severe and chronic pain; severe nausea; seizures, including but not limited to those characteristic of epilepsy; or severe and persistent muscle spasms, including but not limited to those characteristic of multiple sclerosis.

(3) Any other medical condition or its treatment approved by the department, as provided for in section 6(k).

Defendant provided the trial court with copies of his valid registry identification cards and written physician certifications for himself, Jacob, and Winstead. The physician certifications were written on forms provided by the Department of Licensing and Regulatory Affairs (LARA) Michigan Medical Marihuana Registry. On the first page of the certification form, under the section entitled "PATIENT INFORMATION," the form provides the statement "I certify that the above named patient has been diagnosed with the follow medical condition," followed by several checkboxes. Dr. Casab did not complete this section of the physician certification for defendant, Jacob, or Winstead. However, on the second page of each

certification form, following the statement "I certify that the named patient on page 1 of this certification has been <u>diagnosed with the medical condition or treatment that produces, for this patient, one or more of the following</u> and which, in this physician's professional opinion, may be alleviated by the medical use of marihuana (<u>check appropriate box(es)</u>)," Dr. Casab checked boxes for each patient and followed the instruction to "Legibly print the medical condition or treatment" associated with the checked box.[6]

The trial court found that the physician's certifications and registry identification cards did not support defendant's claim that a bona fide physician-patient relationship existed. The trial court made reference to our Supreme Court's instruction in *Hartwick* that valid registry identification cards constitute prima facie evidence of the second and third elements of § 8(a)(1). Nonetheless, the trial court noted that while Dr. Casab's written certifications listed "severe and

---

[6] On the certification form for defendant, Dr. Casab checked the box for "Severe and Chronic Pain," and described the related medical condition or treatment as "surgery – reduced weight – [illegible]." He also included additional notations in a "Physician's Comments" section relating to "severe pains – surgery 3 years." On the certification form for Jacob, Dr. Casab checked the boxes for "Severe and Chronic Pain" and "Severe and Persistent Muscle Spasms," and described the related medical condition or treatment as "severe back pains" and "muscle spasms – [illegible]." He also included additional notations in the "Physician's Comments" section relating to a "car accident – 2013." On the certification form for Winstead, Dr. Casab checked the box for "Severe and Chronic Pain," and described the related medical condition or treatment as "Chronic lower back pain." He also included additional notations in the "Physician's Comments" section relating to "severe back pains – wear n tear – joints – [illegible] issues."

We note that the LARA certification form used by Dr. Casab for defendant, Jacob, and Winstead bore a revision date of "3/13." Defendant's initial application for a registry identification card was approved based upon a physician's certification using an earlier version of the LARA form. That earlier form provided for the same two groupings of checkboxes as did the later form, but included both on the first page of the form, separated by the word, "OR," included a single "Physician's Comments" section, and provided for a single physician's certification/signature line. But it did not provide for the physician to "Legibly print the medical condition or treatment" associated with any checked box in the second grouping of checkboxes. It thus appears that the standard LARA form was revised to split the original groupings of checkboxes into two separate groupings (rather than a dual grouping joined by an "OR"), to provide for separate physician signature lines, and to provide for a description of the "medical condition or treatment" associated with the second grouping of checkboxes. Like Dr. Casab, the physician who signed the certification form for defendant's initially-approved application did not check any boxes within the first grouping of checkboxes (for a "debilitating medical condition"), but instead only checked boxes in the second grouping of checkboxes (for an associated "medical condition or treatment"). Unlike Dr. Casab, the physician did not include any description of any "medical condition or treatment" other than by checking the pertinent boxes in the second grouping of checkboxes (as no further description was then provided for by the form) and did not include any notations in the "Physician's Comments" section.

chronic pain" for defendant, Jacob, and Winstead, Dr. Casab's written certifications did "not certify" that defendant, Jacob, or Winstead had "been diagnosed with any debilitating condition." In doing so, the trial court ignored our Supreme Court's statement in *Hartwick* that the MMMA "requires the state to verify all the information contained in an application for a registry identification card; therefore, a valid registry identification card is prima facie evidence of anything contained in the application." *Hartwick*, 498 Mich at 203 n 10. As stated, Dr. Casab did complete a section on each certification form certifying that the patient had been diagnosed with a medical condition that could be alleviated by medical marijuana and describing the condition at issue, and actually provided more information than had been provided in connection with defendant's initially-approved application. The State of Michigan accepted the applications and certifications and issued valid registry identification cards. Because the state was required to independently verify Dr. Casab's written certifications, the trial court erred when it concluded that Dr. Casab's certifications were defective and therefore did not support defendant's claim that a bona fide physician-patient relationship existed between Dr. Casab and defendant, Jacob, and Winstead.

In sum, we conclude that material questions of fact existed regarding the bona fide nature of the physician-patient relationships in this case, and that the trial court erred by concluding as a matter of law that no such relationships existed. See *Kolanek*, 491 Mich at 413.

## IV. AMOUNT OF MARIJUANA

Defendant also argues that the trial court erred by concluding that there was a material question of fact regarding whether defendant possessed a quantity of marijuana that was not more than reasonably necessary to ensure the uninterrupted availability of marijuana for the purposes of treating or alleviating defendant's, Jacob's, and Winstead's medical conditions. We disagree.

Under § 8(a)(2), the amount of marijuana possessed by a patient and his or her caregiver may not be more than "reasonably necessary to ensure the uninterrupted availability of marihuana for the purpose of treating or alleviating the patient's serious or debilitating medical condition or symptoms of the patient's serious or debilitating medical condition." MCL 333.26428(a)(2). Further, "§ 8 leaves open the volume limitation to that which is 'reasonably necessary.'" *Hartwick*, 498 Mich at 234. This is in contrast to the immunity provision under § 4 of the MMMA, which restricts a caregiver under the MMMA to possessing a total of 2.5 ounces of usable marijuana and usable marijuana equivalents for "each qualifying patient to whom he or she is connected through the department's registration process . . . ." MCL 333.26424(b)(1).

As explained by our Supreme Court, under § 8(a)(2):

Primary caregivers must establish the amount of usable marijuana needed to treat their patients' debilitating medical conditions and then how many marijuana plants the primary caregiver needs to grow in order ensure "uninterrupted availability" for the caregiver's patients. This likely would include testimony regarding how much usable marijuana each patient required and how many marijuana plants and how much usable marijuana the primary caregiver needed in

order to ensure each patient the "uninterrupted availability" of marijuana. [*Hartwick*, 498 Mich at 235.]

Defendant testified that he used "probably 2 and 4 ounces [of marijuana] a week depending on how much pain [he] had." Defendant ingested marijuana by "smoking it and vaporizing it." However, defendant did not keep any records of how much marijuana he used on a weekly basis. Jacob testified that he used "[a]nywhere between an ounce to two ounces" of marijuana each day. Jacob ingested marijuana by "[s]moking it and also vaporing [sic]." When Jacob's supply of marijuana "got low," he told defendant that he "was getting low," and "[w]ithin a couple of days, [defendant] would supply [Jacob] with more."

After Winstead designated defendant as her caregiver, she began receiving marijuana from defendant on a weekly basis. Defendant provided her with 2 to 4 ounces of marijuana per week depending "on the pain that [she] was in per day." Winstead testified that "every 15 minutes, [she] would smoke and then it would ease the pain up and then [she] just kept it on, like you would like as normally prescribed." She clarified that she ingested marijuana only by smoking it.

Defendant testified that he did not provide set amounts of marijuana to his patients on a set schedule, but would provide Jacob and Winstead with marijuana whenever they asked him for some; for Jacob, this was "usually every day." According to defendant, "They, you know, they would call – my brother would be like – hey, man, I'm out, I'm out, I need some more." Defendant clarified that Winstead "would call [him] and ask [him] if she could stop by." Defendant did not keep any records regarding Jacob's or Winstead's usage of marijuana. Defendant testified that Jacob was "using a lot" of marijuana, and that Jacob's testimony that he used between 7 to 14 ounces of marijuana per week was "about right." Defendant also confirmed that Winstead's testimony that she used approximately 2 to 4 ounces of marijuana per week was "about right."

The police report of the raid indicated that a total of 1,022.6 grams (approximately 1.02 kilograms or 36.07 ounces) of marijuana had been seized from defendant's home. However, defendant argued that 512.6 grams (approximately half a kilogram or 18.08 ounces) of the marijuana seized was not usable, but "was what was trimmed off of the plants," and was due to be thrown away. Defendant also argued before the trial court that even if he did not dispute the amount of marijuana that was seized from his home, he would still "not have had enough marijuana to make it through to [his] next grow cycle" and supply himself and his patients with the amounts they used. He confirmed that his conclusion was "[b]ased upon the consumption of" marijuana by Jacob, Winstead, and himself.

When interviewed by the police after the raid, defendant made a statement that he had "too much" marijuana. At the evidentiary hearing, defendant argued that his statement was made in the context of § 4 of the MMMA, which permits a caregiver to possess 2.5 ounces of usable marijuana per patient. See MCL 333.264524.

The trial court held that there was "a material question of fact with regard to whether [defendant] possessed a quantity of marihuana that was more than reasonably necessary to ensure uninterrupted availability to [defendant] and his patients." This was not error. In the first

instance, the actual amount of usable marijuana seized was in dispute. Further, although "a primary caregiver may reasonably rely on the amount his or her patient states is needed to treat the patient's debilitating medical condition," *Hartwick*, 498 Mich at 234, a reasonable juror could conclude in this case that defendant's reliance was not reasonable, see *Kolanek*, 491 Mich at 413. Defendant, Jacob and Winstead asserted at the hearing that they collectively used 11 to 22 ounces of marijuana per week. Defendant testified during the evidentiary hearing that even if he conceded that all 36.07 ounces of marijuana was in fact "usable" marijuana, then he would still have not enough marijuana to "make it through to [his] next grow cycle" based on the rate of marijuana consumption by Jacob, Winstead, and himself. However, defendant admitted that he did not keep records regarding how much marijuana he provided to Jacob and Winstead; rather, he simply provided them with more when they asked for more. Further, defendant made a written statement to the police indicating that he had "too much" marijuana, but later testified that he was referring to § 4 of the MMMA when he did so. On this record, the issue of whether defendant possessed an appropriate amount of marijuana under § 8(a)(2) of the MMMA is properly submitted to the jury. See *Kolanek*, 491 Mich at 413.

Relatedly, the trial court did not determine whether defendant's and his patients' use of marijuana was for a medical purpose. See *Hartwick*, 498 Mich at 237. Defendant, Jacob and Winstead testified that they only used marijuana for medical purposes between April and August 2013. Winstead testified that she would use marijuana every 15 minutes throughout the day and would use a "set amount" of marijuana per day; yet defendant testified that the amount he provided her with varied between 2 and 4 ounces of marijuana per week depending on her pain level. Defendant testified that Jacob used "a lot" of marijuana and that he provided him with more marijuana nearly every day. Neither defendant nor any other party kept any records of the amount of marijuana they used on a weekly basis.

Although the trial court did not rule on this issue explicitly, we conclude that a genuine issue of material fact also exists regarding whether the marijuana use in this case was for a medical purpose. A registration card alone does not suffice to establish prima facie evidence of medical use. See *Hartwick*, 498 Mich at 237. A reasonable juror could find that all or some of defendant's, Jacob's, or Winstead's use of marijuana was not for a medical purpose.

Affirmed with regard to the trial court's determination that material questions of fact existed regarding the amount of marijuana and whether it was reasonably necessary to ensure an uninterrupted supply. Reversed with regard to the trial court's determination that no bona fide physician-patient relationship existed and that defendant's § 8 affirmative defense failed as a matter of law. Remanded to allow defendant to present a § 8 affirmative defense at trial. We do not retain jurisdiction.

/s/ Stephen L. Borrello
/s/ Michael J. Kelly
/s/ Mark T. Boonstra